## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE PARADIGM ALLIANCE, INC.,

       *Plaintiff/Counterclaim Defendant*,

vs.                                                                          Case No. 07-1121-EFM

CELERITAS TECHNOLOGIES, LLC, and
CELERITASWORKS, LLC

       *Defendant/Counterclaim Plaintiff*,

vs.

KEN WILKERSON,

       *Third Party Defendant.*

## MEMORANDUM AND ORDER

This lawsuit is before the Court as a result of a failed business venture. Plaintiff The

Paradigm Alliance, Inc. (Paradigm) produces geographic information systems (GIS) that provide

public awareness information for pipeline safety. Utilities and pipeline companies utilize public

awareness data to identify those who may be affected by operations within a designated

geographical zone, thereby allowing them to identify and notify affected residences and businesses,

emergency responders, or excavators to the presence of the pipeline within their respective

boundaries in compliance with federal regulations. Defendants Celeritas Technologies, LLC, and

Celeritasworks, LLC (collectively "Celeritas"), provide Information technology (IT) services,

including application development and infrastructure management. Paradigm claims that it and

Celeritas entered into a business relationship to jointly develop and own a Community Awareness Cartridge (the Cartridge),[1] and during the course of that relationship, entered into various agreements where Paradigm provided Celeritas with confidential information.  As a result of various alleged conduct by Celeritas, Paradigm filed suit, alleging Celeritas violated the Computer Fraud and Abuse Act,[2] along with state law breach of contract, breach of fiduciary duty, misappropriation of trade secrets, conversion, and fraud claims.  Celeritas subsequently filed several counterclaims against Paradigm and Third Party Defendant Ken Wilkerson (Wilkerson).  Celeritas now moves for summary judgment with respect to all of Paradigm's claims (Doc. 261).  Paradigm also moves for summary judgment on all counterclaims (Doc. 259).  For the reasons explained below, we grant in part, and deny in part Celeritas' motion, and grant in part, and deny in part Paradigm's motion.

## I. Background

The following facts are either uncontroverted or taken in the light most favorable to the non-moving party.

On October 8, 2003, while at a pipeline industry convention, Celeritas marketed a number of its SpatialObjects™ applications, which included its Municipality Cartridge, Oil & Gas Cartridge, Telecom Cartridge, Utility Cartridge, and Tower Management Cartridge.  During this convention, Paradigm's then President, Mark Allen (Allen), met Celeritas' representatives who demonstrated Celeritas' Spatial Objects™/Spatial Data Portal™.

Prior to attending this convention, Paradigm had identified the need for a web-based, public awareness product to allow its customers the ability to access, view, and update their Audit

---

[1]The parties also refer to the Cartridge as the Public Awareness Manager, PAM, Community Awareness Cartridge, CAC, and Community Awareness Portal.  In this Order, we will refer to all the above collectively as "the Cartridge."

[2]18 U.S.C. § 1030.

Documentation and other public awareness data over the Internet.[3]  In response to that need, in September 2003, Paradigm hired a computer programmer, Ragu Vamshi, to develop a GIS public awareness software application.   Mr. Vamshi reviewed Paradigm's concepts and required specifications for a web-based product, and identified the software and hardware required for the product's development.  However, after realizing Celeritas' capabilities at the October conference, Paradigm believed that it might be more efficient to work with Celeritas to develop a web-based product rather than design one in-house.   Thus, Allen informed other Paradigm employees of Celeritas' product, explaining that he felt it met Paradigm's "quest to project [its] documentation on the web."[4]  Thereafter, on October 15, 2003, Paradigm met with Celeritas' representatives for a sales demonstration of its SpatialObjects™/Spatial Data Portal™ product, where Paradigm received information on Celeritas' existing cartridges.   After this meeting, Celeritas sent Paradigm a SpatialObjects™ Questionnaire to gather information about Paradigm's current GIS implementation along with its plans for a SpatialObjects™ project.   It also provided Paradigm with an initial requirements document to allow Paradigm to define various data fields and layouts that might be required by the project.

After the parties' October 15, 2003 meeting, Paradigm received a letter from Celeritas' Brett Lester,[5] wherein he stated his belief that the meeting presented "interesting and exciting partnership possibilities."[6]   The following day, Paradigm claims Allen called Lester, and during that

---

[3]Paradigm's Audit Documentation is the result of its processes, consisting of reports, maps, and mailing lists.  Paradigm provides this documentation to its customers to assist them with proving compliance with federal regulations when audited by state and federal officials.

[4]Doc. 273, p. 5 ¶ 19.

[5]At all relevant times, Brett Lester was either Celeritas' President or its Vice President and General Manager.

[6]Doc. 268-26, p. 2.

conversation, Lester defined the partnership as one where Celeritas and Paradigm would co-develop, co-own, co-market, and co-sell the Cartridge.  Through this arrangement, Paradigm would contribute the concept, its industry knowledge, data, and GIS processes while Celeritas would contribute its expertise in code-writing and its software background.  Paradigm also alleges that Lester informed Allen that Paradigm would be both a co-developer and co-owner with Celeritas in the Cartridge, and they would share in the revenue generated, regardless of which party generated the sale.  After his discussion with Lester, Allen informed Paradigm's management of the proposal, after which they determined that accepting Celeritas' offer would result in faster product development without significant costs.  Thus, Paradigm ceased development of its own product using its in-house programmer.

As a result of their discussions, on November 7, 2003, the parties executed a Confidentiality and Non-Disclosure Agreement that imposed upon Celeritas certain disclosure and use restrictions regarding information disclosed by Paradigm and identified as confidential.  Subsequent to that agreement and at Celeritas' request, on January 5, 2004, the parties' executed a Mutual Non-Disclosure Agreement to protect not only Paradigm's confidential information, but also any confidential information disclosed by Celeritas to Paradigm.

In November 2003, the parties began to develop the Cartridge.  During development, Paradigm disclosed its GIS processes, along with providing the data layers, or datasets, derived from those processes for certain Cartridge implementations.[7]  Celeritas then took this information, along

---

[7]These data layers or datasets include buffers, carrier routes, and audience data.  Paradigm also claims it disclosed certain confidential information to Celeritas even before the development period began based on the parties' verbal agreement to co-develop the Cartridge and before either of the non-disclosure agreements were executed.

-4-

with the "Shell Data"[8] received from Paradigm, and completed a prototype for demonstrating the Cartridge to individual customers at trade shows and other marketing events.

In late January 2004, the parties met to discuss the marketing and sales of the Cartridge and developed a Software Product Description (Product Description) that included a summary of the product's functionality, screen shots, descriptions, figures, and examples of data output from the prototype Cartridge.  A complete "Media Kit" was developed by the end of January containing flash videos of the Cartridge, the Product Description, a PowerPoint presentation of the Cartridge, and other marketing materials.[9]  Some time thereafter, Celeritas forwarded to Paradigm a "Partnering Document" that outlined the parties' mutual goals and expectations, defined the intent of their "partnership,"[10] and identified the percentage of compensation each would receive for sales depending on which party initiated the lead.

On February 19, 2004, Celeritas filed a provisional patent application (Provisional Application) for the Cartridge with the United States Patent and Trademark Office (Patent Office). While Celeritas included within the Provisional Application the Product Description developed by the parties, Paradigm claims that Celeritas altered the description by removing all indications of Paradigm's contributions to the Cartridge along with any suggestion that Paradigm had any

---

[8]"Shell Data" refers to information derived from Audit Documentation provided to Shell Oil Company by Paradigm.  Disputed issues of material facts exist as to whether Paradigm had Shell Oil Company's permission to provide this information to Celeritas for use in the Cartridge.

[9]The Media Kit presented Celeritas and Paradigm to the relevant market as teaming up "to form a powerful alliance," and included a logo, which Paradigm claims, demonstrates the parties' intent to form a joint venture.

[10]The Partnering Document provides that the intent of the partnership "between Paradigm and Celeritas is to help both companies penetrate and/or expand their business in the Pipeline marketplace.  The two companies believe that by combining their collective assets, skills, and abilities that they can better serve the Pipeline marketplace and therefore grow their respective business."  Doc. 261-25, p. 1.

ownership in it.  The Patent Office did not publish or otherwise make available to the public the Provisional Application, nor did Celeritas notify Paradigm of it either prior to or after its filing.

In April 2004, Allen and Lester began to work on a Service Agreement in which the parties intended to state, in general terms, the provisions by which Celeritas would perform services and provide software support, website hosting, internet access and other services to Paradigm's customers.  After completing a first draft of this document, Allen, upon Lester's recommendation, provided it to Paradigm's attorney, Bill Dakan, to review and revise as needed.  Mr. Dakan admitted that the Service Agreement was neither intended to memorialize that a joint venture existed, nor was it intended to eliminate any partnership or joint venture that may have existed or redefine such a relationship to that of an independent contractor.  Incorporated within the Service Agreement was the parties' Joint Marketing Plan, in which the parties expressed the importance of each maintaining the image of not competing with the other in their relevant market.  Also integrated in the Service Agreement was a Sample Software License Agreement that identified Celeritas as an independent contractor and not a partner or joint venturer with Paradigm.  The parties never executed the Service Agreement or any of the incorporated documents.

In late September 2004, Celeritas provided Paradigm with a proposed Reseller Agreement. While the parties had negotiated this agreement, Paradigm contends that it was surprised by Celeritas' initial draft as the provisions within were in stark contrast to the parties' previous conduct regarding their joint venture relationship.  Nevertheless, the Reseller Agreement was executed in February 2005.[11]

---

[11]The parties agreed, as the Reseller Agreement reflects, that the agreement became effective December 2004.

The Reseller Agreement designated the parties as independent contractors and provided for the confidentiality of information relating to software computer programs disclosed by either party. They further agreed that each would not compete with the other during the term of the agreement or offer the same or similar products or services to the marketplace.  While the Reseller Agreement incorporates the parties' January 5, 2004 Non-Disclosure Agreement, it does not otherwise address the parties conduct or relationship prior to the agreement's effective date of December 2004.

Paradigm admits that upon signing the Reseller Agreement, any joint venture or partnership with respect to the Cartridge terminated, and thereafter, the parties proceeded in a reseller relationship.[12]  Paradigm understood that by executing the Reseller Agreement, it released any ownership rights it had in the Cartridge to Celeritas.  Paradigm based its decision to end the joint venture, in part, because of the liability it perceived existed in continuing with a business relationship with Celeritas.  Paradigm contends that because of problems it encountered with Celeritas' ability to present Paradigm's data on the Internet in May 2005, it terminated the relationship.

On February 17, 2005, Celeritas filed a non-provisional patent application for the Cartridge, at which time it requested that the Patent Office not publish or otherwise make the application available to the public.  As with its provisional patent application, Celeritas did not discuss with Paradigm, either prior to or after filing, of its intent to patent the Cartridge.

After the parties terminated their business relationship, Paradigm hired its own software developers to build a different public awareness product.  Rather than develop a product similar to the Cartridge, Paradigm chose to build an alternative, non-GIS desktop product known as PDQ,

---

[12]Celeritas denies the existence of any joint venture or partnership prior to the Reseller Agreement regardless of Paradigm's contentions.

which it launched in 2006.  In February 2007, while developing a web-based version of its PDQ software, PDQWeb, Paradigm received a letter from Celeritas indicating that it was aware of Paradigm's efforts to develop PDQWeb, and also notified Paradigm of its pending patent applications on the Cartridge.  Celeritas further warned Paradigm that its current development of PDQWeb potentially infringed the system described in Celeritas' non-provisional patent application, and any further marketing or sales of PDQWeb would put Paradigm in harms way once Celeritas' patent issues.[13]  Notwithstanding this warning, in May 2007, Paradigm released PDQWeb.

After releasing PDQWeb, in November 2007, Paradigm discovered Celeritas' apparent attempts to access its website, and in response, hired an outside consultant, David Jablonski, to investigate.  Mr. Jablonski's investigation consisted of reviewing Celeritas' attempted access, how those attempts to gain access were made, and as a result, whether any damage to its system or data had occurred.  The investigation revealed that Celeritas had in fact attempted to access Paradigm's PDQWeb application using variations of URL's, usernames, and passwords.  Celeritas' Product Manager, Larry Miley, admitted that Lester asked him to try to access Paradigm's website, and at that time, he recognized that his attempts were unauthorized.  In attempting access, Miley used the username and password of one of Celeritas' customers, Charles Columbus, whom Paradigm had previously given permission to access the website.  Celeritas contends that Mr. Columbus had given them permission to use his username and password to access Paradigm's website; however, Paradigm disputes this claim.  Celeritas' attempt to gain access to PDQWeb was unsuccessful, and as a result, there was no damage or data compromise to Paradigm's website.  However, in

---

[13]Paradigm disputes Celeritas' contention that Paradigm was aware of its patent applications prior to this letter.

responding to Celeritas' actions, Paradigm was required to pay Mr. Jablonski $6,015.00 for his services.

In August 2006, Ken Wilkerson, a co-owner of Paradigm, attended a Environments Systems Research Institute (ESRI) User's Conference, where he had the opportunity to speak with ESRI's Regional Director, Steve Kinzy (Kinzy).[14]  During this conversation, Celeritas claims that Wilkerson spoke with Kinzy about patents, during which time he informed Kinzy that Celeritas was patenting its linking to ESRI's product, ArcIMS.[15]  Wilkerson also informed Kinzy that Celeritas was suing clients based on this patent.  After this conversation, Kinzy relayed Wilkerson's statements to ESRI's Business Partner Program coordinator, Eilene Nettleton-Stanger, who in turn, relayed the comments to others within ESRI.  Celeritas claims that based on Wilkerson's statements, ESRI decided to not renew Celeritas' membership in ESRI's Business Partner Program.

Paradigm sues Celeritas for breach of contract, breach of fiduciary duty, fraud by promise of future events, fraud by silence, fraudulent inducement, conversion, misappropriation of trade secrets, and violation of the Computer Fraud and Abuse Act.  Celeritas asserts counterclaims for defamation, tortuous interference with contracts, tortuous interference with business expectations, false advertising and commercial disparagement in violation of the Lanham Act, breach of contract, and violation of the Computer Fraud and Abuse Act.

## II. Summary Judgment Standard

The Court is familiar with the standards governing the consideration of Summary Judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

---

[14]As of 2006, Celeritas and ESRI had been doing business together for a number of years, and Celeritas was a member of ESRI's Business Partner Program.  Wilkerson, through a separate business in which he was an owner, GISEDGE, was also a member of ESRI's Business Partner Program.

[15]Paradigm denies that Wilkerson made these statements in the context Celeritas alleges.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[16]  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[17]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim.[18]  In considering a motion for summary judgment, the Court must examine all of the evidence in a light most favorable to the nonmoving party.[19]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.[20]  The moving party is not required to disprove the nonmoving party's claim or defense, but must only establish that the factual allegations have no legal significance.[21]  If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial.[22]  In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations.[23]  The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[24]

---

[16]Fed. R. Civ. P. 56(c)).

[17]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[18]*Id.*

[19]*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[20]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[21]*Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

[22]*Celotex*, 477 U.S. at 323.

[23]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[24]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[25]

## III. Analysis

## 1. Defendants' Motion for Summary Judgment

In its motion, Celeritas asserts that there are no disputed issues of material fact so as to preclude the Court from granting summary judgment in its favor with respect to all of Paradigm's claims. Paradigm alleges that Celeritas: (1) breached its fiduciary duty and duty of good faith and fair dealing arising from its joint-venture business relationship; (2) committed fraud by promise of future events; (3) committed fraud through silence; (4) committed fraud by inducement; (5) misappropriated Paradigm's trade secrets; (6) breached its November 2003 Non-Disclosure Agreement; (7) breached the parties' January 2004 Non-Disclosure Agreement; (8) breached the parties' February 2005 Reseller Agreement; (9) converted Paradigm's property; and (10) violated the Computer Fraud and Abuse Act. The Court will address each in turn in the order presented by the parties.

### a. Breach of Fiduciary Duty and Duty of Good Faith and Fair Dealing (Joint Venture) (Count IV)

A joint venture is "an association of two or more persons or corporations to carry out a single enterprise for profit."[26] A joint venture may only exist by agreement of the parties, and where its

---

[25]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[26]*George v. Capital South Mortgage Invs., Inc.*, 265 Kan. 431, 448, 961 P.2d 32, 44 (1998); *see also Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 77, 596 P.2d 816, 823 (1979).

existence is controverted, can be found through the mutual acts and conduct of the parties.[27]
Although no particular factor is determinative, conduct or acts indicative of a joint venture include:
(1) the joint ownership and control of property; (2) the sharing of expenses, profits, and losses; (3)
a community of control over and active participation in the management direction of the business
enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint
agreement.[28]   The party asserting the joint venture has the burden of proving its existence.[29]
Similarly, a party seeking to establish that another party owed it a fiduciary duty has the burden of
proving the existence of a fiduciary relationship, and must do so by clear and convincing evidence.[30]
Although "[f]iduciary relationships cannot be established inadvertently and cannot be forced upon
another party,"[31] one may be inferred when a joint venture is found to exist.[32]

Celeritas denies forming a joint venture with Paradigm at any time during the parties'
business relationship, but instead, claims that the relationship was one of customer-vendor. Celeritas
contends that the parties' Reseller Agreement, executed in February 2005 but effective December
20, 2004, is the sole agreement executed by the parties that defines their business relationship.
Celeritas argues that this Reseller Agreement "is the written embodiment of both the intent and the
reality of Celeritas' and Paradigm's fourteen month business relationship to that date."[33]   Celeritas

---

[27]*Pulsecard Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1478, 1485 (D. Kan. 1996); *George*, 265 Kan. at 448, 961 P.2d at 44.

[28]*Modern Air Conditioning*, 226 Kan. at 76, 596 P.2d at 823.

[29]*Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1547 (D. Kan. 1993).

[30]*See Pulsecard*, 917 F. Supp. at 1484 (citing *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990)); *see also Wolf v. Brungardt*, 215 Kan. 272, 284-85, 524 P.2d 726, 736 (1974).

[31]*Pulsecard*, 917 F. Supp. at 1484.

[32]*First Bank of Wakeeney v. Peoples State Bank*, 12 Kan. App. 2d 788, 793, 758 P.2d 236, 240 (1988).

[33]Doc. 273, p. 44.

asserts that the Reseller Agreement is complete and unambiguous, and Paradigm's attempt to now claim a joint venture is directly at odds with the language of that agreement. Celeritas further argues that even looking at parol evidence confirms that it never entered, or even intended to enter into a joint venture with Paradigm.[34] Celeritas asserts that documents exchanged by the parties, along with their behavior, confirms that it and Paradigm did not co-own or co-develop the Cartridge, but instead, merely cooperated as separate business entities in an arms-length transaction. As a result, Paradigm's claim that a joint venture existed fails.

Paradigm contends that the parties' business relationship was much different than that suggested by Celeritas. Paradigm asserts that it and Celeritas agreed to co-develop, co-market, co-sell, and co-own the Cartridge, and denies that the Reseller Agreement altered the joint venture created prior to that document becoming effective. While Paradigm agrees that the parties were not in a joint venture after they executed the Reseller Agreement, it contends that a joint venture existed prior to that agreement from October 17, 2003 to December 20, 2004. It argues that because the parties did not begin to discuss or negotiate the terms of the Reseller Agreement, if at all, until September 2004, the parties conduct and other evidence indicating the existence of a joint venture cannot have originated from the negotiations leading up to the Reseller Agreement. It contends that Celeritas' arguments ignore the controlling time period of their relationship. Paradigm also argues that Celeritas ignores Kansas' definition of a joint venture, which matches the parties' conduct and is practically identical to Lester's description of their relationship. Moreover, Paradigm asserts that Celeritas' own management admitted they were in partnership with Paradigm to develop the Cartridge. Thus, Paradigm contends, Celeritas' arguments fail.

---

[34]Celeritas contends that because the Reseller Agreement is complete and unambiguous, parol evidence of prior oral or written agreements between the parties is inadmissible.

After reviewing the parties arguments and the voluminous exhibits provided in support of the facts asserted by each, the Court concludes that Paradigm has provided sufficient evidence to demonstrate the existence of genuine issues of material fact that precludes the Court from granting summary judgment on this claim at this stage of the litigation.   Both parties dispute sufficient material facts relating to every factor for determining a joint venture with the exception of the fixing of salaries by joint agreement, thereby making the question of whether a joint venture existed between Paradigm and Celeritas one for the jury to decide.   Because a fiduciary relationship may be inferred where a joint venture exists, we need not address whether a fiduciary relationship is implied in law at this time.[35]   Accordingly, we deny summary judgment with respect to Paradigm's joint venture claim (Count IV).

### b.  Fraud by Promise of Future Events (Count V)

Paradigm claims that Celeritas committed fraud by promise of future events in that in an effort to entice Paradigm to release its confidential information, Celeritas: (1) promised to uphold and protect Paradigm's confidential information, along with respecting Paradigm's ownership interest in it; (2) promised to work jointly with Paradigm to create, market, develop, and sell the Cartridge; and (3) promised that both parties would jointly own the Cartridge.[36] Celeritas argues that Paradigm cannot maintain its first assertion because it relies on the same basis as its breach of contract claim.   To maintain this fraud claim, Celeritas contends that the basis of the claim must be different from the conduct upon which Paradigm bases its claim for breach of conduct.   Celeritas also asserts that, based on the parties' subsequent Reseller Agreement and other documents

---

[35]*See First Bank of Wakeeney v. Peoples State Bank*, 12 Kan. App. 2d 788, 793, 758 P.2d 236, 240 (1988).

[36]Doc. 66, p. 23.

-14-

exchanged between them, Paradigm could not have reasonably relied on the idea that it co-owned the Cartridge, and therefore, summary judgment is appropriate.[37]

Paradigm contends that its claim of fraud based on promise of future events is not based on conduct related to its breach of contract claims, but rather, is based on Celeritas' misrepresenting its intent to honor its promises - promises Paradigm claims Celeritas never intended to keep at the time it made them.  Paradigm  asserts that based on the promises Celeritas made in October 2003 before the parties executed the November 2003 Non-Disclosure Agreement, Paradigm provided Celeritas with confidential information.  Paradigm contends that it would not have disclosed its confidential information had it known Celeritas had no intention of keeping the promises it made in October 2003.

Under Kansas law, "[a]ctionable fraud includes an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage."[38] When a plaintiff's fraud claim concerns promises or statements of future events, "the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent misrepresentation concerning a present, existing intention to perform, when no such intention existed."[39]  "A promise to do something in the future, if the promisor had no intention at the time the promise was made to carry it out, is deceit, and if the promisor obtained anything of

---

[37]Celeritas does not address Paradigm's claim that Celeritas promised to work jointly to co-create, co-market, co-develop, and co-sell the Cartridge.

[38]*Gerhardt v Harris*, 261 Kan. 1007, 1013, 934 P.2d 976, 981 (1997) (citing *Albers v. Nelson*, 248 Kan. 575, Syl. ¶ 5, 809 P.2d 1194 (1991)).

[39]*Id.* (citing *Modern Air Conditioning*, 226 Kan. at 78, 596 P.2d at 824).

value by reason thereof, there is actionable fraud."[40]  Damages resulting from such fraud, however, must be greater than those damages caused by the breach of contract alone.[41]

To succeed on this claim, Paradigm must prove that, at the time Celeritas made the aforementioned promises to Paradigm, it had no intention of keeping them.  Paradigm must also show that the promises were made with the intent to deceive or induce Paradigm into disclosing its confidential information, described by Paradigm as its ideas, information, and contributions to the Cartridge.  In addition, Paradigm must prove that it reasonably relied upon the promises, and that it sustained damages independent of its breach of contract claims.  Paradigm must prove its fraud claim by "a preponderance of the evidence, but that evidence must be clear, convincing, and satisfactory."[42]

Here, Paradigm claims that in October 2003, Lester, Celeritas' President, made the aforementioned promises to Allen while at that time, he never intended to keep those promises.  In support, Paradigm points to the timekeeping records of James Stipek, a patent attorney for Celeritas, that indicates that Mr. Stipek performed services for Celeritas on December 2, 2003 relating to a provisional patent application.  Paradigm suggests that this record, combined with Celeritas' provisional patent application filed soon thereafter, its non-provisional patent application, and Celeritas' cease-and-desist letter all demonstrate that Celeritas did not have the intent to keep its promises when Lester made them in October 2003.

After a careful and thorough review of the record, we find that Paradigm has failed to demonstrate by a preponderance of the evidence that, at the time Lester made the alleged promises

---

[40]*Id.* at 1014, 934 P.2d at 981.

[41]*Heller v. Martin*, 14 Kan. App. 2d 48, 54-55, 782 P.2d 1241, 1245 (1989).

[42]*Modern Air Conditioning*, 226 Kan. at 78, 596 P.2d at 824.

in October 2003, he did not intend to keep them.  The only evidence before the Court relates to actions taken at a later date – actions which could have resulted from a change of intent at any time *after* the promises were made.  Because Paradigm has failed to bring forth any significant admissible probative evidence supporting its allegations, Celeritas is entitled to summary judgment on this claim.

### c. Fraud by Silence (Count VI)

To establish fraud by silence under Kansas law,[43] a plaintiff must prove by clear and convincing evidence: (1) that the defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to plaintiff.[44]

Paradigm claims that Celeritas committed fraud by silence by filing a provisional patent application on February 19, 2004 (Provisional Application), and by filing a non-provisional patent application on February 17, 2005 without ever informing or disclosing to Paradigm either its plans to file or the actual filing of the applications, notwithstanding that Celeritas owed Paradigm a duty as a result of the parties' joint venture relationship.  Paradigm alleges that Celeritas' secret attempts to patent the Cartridge, which incorporates Paradigm's ideas, information, and contributions, is

---

[43]Under Kansas law, "fraud by silence" and "fraudulent concealment" are terms referring to the same cause of action. *Larson v. Safeguard Props., Inc.*, 379 F. Supp. 2d 1149, 1152 (D . Kan. 2005) (citing *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906 (10th Cir. 2005)).

[44]*McLellan v. Raines*, 36 Kan. App. 2d 1, 9, 140 P.3d 1034, 1040 (2006) (quoting *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 267 Kan. 245, 260, 978 P.2d 922, 932 (1999)).

evidenced by Celeritas' specific request of the Patent Office to not publish or otherwise make public its patent applications.  Paradigm contends that this request, along with Celeritas' failure to inform Paradigm of the patent filings, is a clear indication of Celeritas' deliberate, and fraudulent, concealment of its patent efforts.

Celeritas asserts that summary judgment is appropriate because Paradigm cannot show by clear and convincing evidence that, through reasonable diligence, it attempted to discover Celeritas' intent to file the patent applications regarding the Cartridge.  In addition, Celeritas denies that it had any legal duty to disclose the patent applications to Paradigm, as they were neither in a joint venture nor had it agreed to any fiduciary relationship with Paradigm.  Lastly, Celeritas argues that Paradigm cannot show that it justifiably relied on Celeritas to communicate such information concerning the patent applications for the Cartridge.

Celeritas contends that Paradigm has not proven that it could not have discovered through reasonable diligence that Celeritas intended to file the patent applications related to the Cartridge. Celeritas asserts that at the parties' first meeting in October 2003, Celeritas informed Paradigm that its SpatialObjects™ software was both patented and had patents pending.  Celeritas argues that after receiving this information and throughout their business relationship, Paradigm failed to at any time investigate on its own whether it had any patent rights in the Cartridge.  Moreover, Celeritas claims that Paradigm had a duty to at least ask about patent activity because of Celeritas' sales documents in which it claimed patent rights to the Cartridge.[45]  Celeritas also asserts that Paradigm's claim fails because it has failed to show that Celeritas had any legal duty to communicate to Paradigm information related to its patent filings.  Celeritas argues that because there was no joint venture, and

_____

[45]Because Celeritas fails to cite to any specific sales document for the Court's review, we treat this proposition as an unsupported fact.

because it did not consent to a fiduciary relationship, it was under no legal duty to disclose.  Lastly, Celeritas argues that Paradigm has failed to demonstrate that it justifiably relied on the idea that Celeritas would not file a patent application for the Cartridge.  For the reasons previously argued relating to Paradigm's joint venture claim, Celeritas asserts that Paradigm had no reason to rely on the proposition that it was a joint owner in the Cartridge.  As a result, Paradigm's claim fails.

Paradigm argues that, contrary to Celeritas' contentions, no reasonable diligence by Paradigm would have led to discovery of these documents.  Paradigm denies that it had any duty to investigate or ask Celeritas about its patent activity because they had a fiduciary relationship, and therefore, Paradigm counted on Celeritas' "full, fair, open and honest disclosure of everything affecting the relationship."   Paradigm further disputes Celeritas' claim that the entire SpatialObjects™ "software suite" was patented, but rather, Celeritas only represented that SpatialObjects™ was patented, which did not include the Cartridge.  In fact, Paradigm asserts that it did speak with an intellectual property (IP) attorney generally, as Celeritas suggested, but only discussed copyrights, not patenting the Cartridge.  Paradigm contends that there was no reason to speak with IP counsel about patenting the Cartridge for itself, as it had created the Cartridge with Celeritas.  As the parties were joint venturers, Paradigm relied on Celeritas to be open and forthcoming with respect to developments concerning the Cartridge.

After reviewing the parties' argument and supporting evidence, we find Celeritas' arguments unpersuasive.  By its own admission, when it filed the patent applications, it requested that they not be published or made available to the public.  Celeritas has failed to indicate how Paradigm could have discovered these unpublished, non-public documents other than to state that Paradigm should have simply asked Celeritas.  This contention raises the question of what should have prompted Paradigm to ask Celeritas about patents when, at the time, it had no knowledge Celeritas was

involved in the process of patenting the Cartridge.  While Celeritas indicates that its sales documents demonstrate its intent to patent the Cartridge, it has failed to identify specific documents for the Court to consider in determining this issue.[46]

Because we have already determined that Paradigm has presented sufficient evidence so as to withstand summary judgment on its joint venture claim, which if proven at trial, infers a fiduciary relationship, we conclude for purposes of this motion that Celeritas has not demonstrated that no legal duty existed requiring Celeritas to communicate with Paradigm its intent to patent the Cartridge.  Therefore, summary judgment on this claim is denied.

### d.  Fraud by Inducement (Count VII)

Paradigm alleges that Celeritas committed fraud by inducement in that, "[s]tarting in October 2003 and continuing throughout the parties' relationship, Celeritas made false representations or purposeful omissions of material facts regarding its intentions, patent prosecution, and use of Paradigm's ideas and information," knowing that the statements made were false and material.[47]

Celeritas first argues that summary judgment is appropriate regarding this claim because Paradigm has failed to identify any specific conversations, comments, or representations allegedly made by Celeritas where it intentionally misrepresented or omitted material facts concerning the Cartridge or Paradigm's ideas or other information.  Celeritas also suggests summary judgment is appropriate because, as with Paradigm's other fraud claims, Celeritas was under no legal duty to disclose its alleged "omissions," and Paradigm's reasonable reliance of any misrepresentation is subject to the same standard as argued in Count V, and therefore, fails.

---

[46]When a party fails to properly cite, or improperly cites, to evidence in the record, the Court may, but is not obligated to, search for and consider evidence in the record that would support a party's arguments.  *See Mandeville v. Quinstar Corp.*, 2000 WL 1375264, at *3 (D. Kan. Aug. 29, 2000).

[47]Doc. 236, p. 25.

In its response, Paradigm essentially incorporated its arguments from the previously discussed fraud claims, and thus, we will not restate those arguments here.  Paradigm, however, did not respond to Celeritas' claim that Paradigm failed to identify any particular circumstance of fraud other than to reassert its general allegations.

While a party alleging fraud may allege generally the condition of a person's mind, the claim must "state with particularity the circumstances constituting [the] fraud."[48]  Thus, a party alleging fraud "must describe the circumstances of the fraud, i.e., the time, place, and content of the false representation; the identity of the person making the representation; and the harm caused by the complainant's reliance on the false representation."[49]  Paradigm, however, does not allege with particularity, with regard to this claim, any fraudulent act by Celeritas or its employee representatives relating to the parties' non-disclosure agreements, the Reseller Agreement, or the patent applications, but instead, simply refers generally to Celeritas' continuing false representations and omissions throughout their relationship.  Paradigm's claim does not comply with Rule 9(b), and therefore, summary judgment is appropriate for this claim.  Because we grant summary judgment on this basis, we need not address Celeritas' remaining arguments.

### e. *Misappropriation of Trade Secrets (Count IX)*

Paradigm alleges that Celeritas misappropriated its trade secrets, in violation of K.S.A. § 60-3320, *et seq.*, when it prepared, filed, and prosecuted its patent applications, and by using Paradigm's trade secrets in creating its own public awareness programs to compete directly with Paradigm.  Celeritas argues that it is entitled to summary judgment because of: (1) Paradigm's

---

[48]Fed. R. Civ. P. 9(b).

[49]*Zhu v. Countrywide Realty, Co., Inc.*, 165 F. Supp. 2d 1181, 1200 (D. Kan. 2001) (citing *Smith v. MCI Telecomms. Corp.*, 678 F. Supp. 823, 825 (D. Kan. 1987)).

failure to identify its alleged trade secrets with specificity as required by law; (2) Paradigm's widespread marketing of the same information it claims as a trade secret bars any claim that the information was "secret;" and (3) Paradigm's failure to provide any evidence that Celeritas has misappropriated any such trade secret, assuming the information, in fact, qualifies as a trade secret.

Celeritas suggests that Paradigm has failed to identify its trade secrets, and as a result, it is entitled to summary judgment.  After Paradigm provided a vague interrogatory answer on the issue along with including information concerning items obviously not trade secrets, the Court, on March 7, 2008, directed Paradigm to provide in specific detail the trade secrets allegedly misappropriated by Celeritas.[50]  Celeritas argues that rather than obeying the Court's directive, Paradigm responded by merely providing the names of the processes it claims to be trade secrets, which, Celeritas suggests, is "wholly inadequate to identify a trade secret."  Celeritas further contends that Paradigm's failure to designate its later discovery responses as "Confidential" or "Attorneys' Eyes Only," actions inconsistent with a trade secret, demonstrates that the descriptions provide so little information so as to be insufficient.

In its response, Paradigm claims that it properly identified its trade secrets pursuant to the Court's Order.  Paradigm further contends that its descriptions provided Celeritas with sufficient information to explore Paradigm's claims in subsequent depositions.[51]  Paradigm asserts that rather than depose Allen about all trade secrets identified in its discovery response, Celeritas' counsel

---

[50]*Paradigm Alliance, Inc. v. Celeritas Tech., LLC*, 2008 WL 678700, at *3-4 (D. Kan. Mar. 7, 2008).

[51]On August 15, 2008, Celeritas served notice upon Paradigm to take a deposition to cover topics related to Paradigm's GIS capabilities and usage, its methods of collecting geographically relevant audience data, knowledge regarding interrogatory answers, and information regarding trade secrets or confidential information alleged misappropriated.  Doc. 188, pp. 4-5, 8.  Celeritas subsequently deposed Paradigm's President, Mark Allen, on August 28, 2008, and its Vice President of Business Applications/Vice President of GIS IT, Matthew Brunett, on August 29, 2008.

chose to inquire as to only one, and upon apparently being satisfied with Allen's responses, proceeded with the deposition but on a different topic.  Similarly, Paradigm argues, which Celeritas does not dispute, that Paradigm presented Matthew Brunett for a full-day deposition, at which time he was prepared to discuss every trade secret; however, Celeritas' counsel ended his deposition after a little over two hours.  While Celeritas questioned Brunett about many topics during his deposition, its counsel chose to question him with regard to only one identified trade secret.  As a result, Paradigm argues that Celeritas' request for summary judgment on Paradigm's misappropriation of trade secrets claim should be denied.

The Kansas Uniform Trade Secrets Act (KUTSA) defines a trade secret as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i)   derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii)   is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[52]

While the question of whether a trade secret exists is a question for the trier of fact, the proponent of the claim must come forward with some showing that the information alleged to be a trade secret meets the definition.[53]  This burden is not met by general allegations; rather, it must be met by describing "the subject matter of their trade secrets in sufficient detail to establish each element of a trade secret."[54] Paradigm has the burden under the KUTSA to define its trade secrets

---

[52]Kan. Stat. Ann.  § 60-3320(4).

[53]*Bradbury Co., Inc. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1221-22 (D. Kan. 2006).

[54]*Id.* (quoting *BioCORE, Inc. v. Khosrowshahi*, 96 F. Supp. 2d 1221, 1231 (D. Kan. 2000); *see also Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994) (a trade secret "must possess at least that modicum of originality which will separate it from everyday knowledge").

with the precision and particularity necessary to separate it from the general skill and knowledge possessed by others.[55]  This burden, however, does not require a plaintiff to plead its trade secrets in detail, as such a disclosure would effectively amount to a surrender of the trade secret.[56]

Here, Paradigm has identified a number of its processes as trade secrets, and has indicated the specific task that each of these processes completes.[57]  For example, Paradigm identified as trade secrets its processes for reassembling or resequencing carrier route data into Line of Travel format; its process of expanding buffers to account for geocoding offsets; and its process of only identifying zip codes constituting three percent of the affected county.  Contrary to Celeritas' contention, Paradigm has provided more than simply the name of a process, but rather, has provided a description sufficient to indicate the particular process to which Paradigm refers without disclosing the underlying trade secret.  It has provided a description of each process, concise as that description may be, that provided Celeritas the ability to inquire into the details of each process during discovery.  Further, Paradigm has provided the deposition testimony and declarations of its representatives in support of its assertion that it is these processes, working collectively, that allow it to manipulate and combine data to accurately identify the stakeholder audiences required by federal regulation to be notified under certain circumstances.  Also, it is these processes that provides economic value to customers by eliminating the need to provide notice concerning activities related to its business, as required by federal regulations, to the "universe of addresses" surrounding the customer's pipelines.  Paradigm has also taken steps to maintain the secrecy of these

---

[55]*See id.*

[56]*See Cobalt Flux, Inc. v. Positive Gaming AS*, 2008 WL 4534182, at *3 (D. Utah Oct. 6, 2008) (citing *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 24 (D.D.C. 2002) (claiming a trade secret does not give rise to a heightened pleading standard)).

[57]*See* Doc. 273-17.

-24-

processes, as evidenced by its non-disclosure agreements.  As a result, Paradigm has sufficiently identified the processes it claims as trade secrets.

"Even if the plaintiff establishes the existence of a valuable trade secret which has been subject to reasonable efforts to maintain secrecy, the plaintiff must establish that there has been a misappropriation of the trade secret by the defendant."[58]  "Misappropriation" is defined as:

(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[59]

Paradigm claims that Celeritas misappropriated its trade secrets (i.e., the processes that produce the data) by filing its patent applications for the Cartridge.  Celeritas argues that Paradigm has failed to present any evidence that proves Celeritas used or disclosed any "actual" trade secret as is required by the KUTSA.  Paradigm, however, contends that Celeritas "used" its trade secrets

---

[58]*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 107 F. Supp. 2d 1307, 1310 (D. Kan. 2000).

[59]Kan. Stat. Ann. § 60-3320(2).

-25-

in the patent applications within the scope of the KUTSA because the Cartridge exists only because of the datasets created through the use of Paradigm's processes. Because there is no Cartridge without these processes, Paradigm argues that by filing its applications to obtain a patent – applications in which Celeritas described functions directly tied to these processes – it used Paradigm's trade secrets within the scope of the KUTSA. Paradigm further alleges that because of the parties' joint venture and resulting fiduciary duty, and the parties' non-disclosure agreements, Celeritas knew it had a duty to protect these secrets and prevent their use without Paradigm's consent. As a result, Paradigm claims genuine issues of material fact exists, and summary judgment is inappropriate.

The Court finds Paradigm's arguments persuasive. When submitting a patent application for a product, if that product embodies a person's trade secrets, or relies on the trade secrets to another party's enrichment, such action constitutes "use" under the KUTSA.[60] Here, Celeritas' patent applications provide specific descriptions of the Cartridge's functions and data capabilities that, Paradigm claims, are an integral part of the Cartridge itself, without which, the Cartridge would not function as intended. Paradigm maintains that it did not consent to Celeritas' use of its trade secrets, and, based on the parties implied fiduciary duty imposed by the joint venture, assuming Paradigm sufficiently proves that claim at trial, and based on the discussion below in subsection (f), Celeritas had a duty to maintain their secrecy. Therefore, because Paradigm has set forth specific

---

[60]*See Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir. 2007) (noting that "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use'" . . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute "use.") (internal citation omitted); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (indicating that marketing products that embody a trade secret constitutes "use"); *02 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005).

facts showing that there is a genuine issue for trial, Celeritas' request for summary judgment on this claim is denied.

### f. *Breach of Contract (Counts I-III)*

Paradigm alleges that Celeritas breached both of the parties' Non-Disclosure Agreements, the first executed in November 2003, and the second in January 2004.  Paradigm claims that Celeritas breached these agreements by preparing, filing, and prosecuting its patent applications in which it used Paradigm's confidential information and trade secrets.  In addition, Paradigm contends that Celeritas breached its duty of good faith and fair dealing by using Paradigm's ideas and information in its patent applications without disclosing such use to Paradigm, and by treating Paradigm's ideas and  information as its own, further breached the Non-Disclosure Agreements. Paradigm also alleges Celeritas breached their February 2005 Reseller Agreement.  As its basis for this claim, Paradigm asserts that by prosecuting its patent applications in an effort to retain exclusive use of the Cartridge, Celeritas breached its agreement to not compete during the term of the Reseller Agreement.

Celeritas first asserts that it is entitled to summary judgment on all of Paradigm's breach of contract claims because the patent applications contain no information that qualifies as "Confidential Information" pursuant to the terms of the agreements.  Celeritas suggests that, as with Paradigm's arguments regarding alleged trade secrets, Paradigm's claims regarding "confidential information" fail because Paradigm made the information it claims confidential available to the public through its marketing materials and Audit Documentation.  Celeritas asserts it did nothing more than include this same publicly-available information in its patent application, and therefore, did not breach any of its agreements with Paradigm.

-27-

In response to Celeritas' contentions, Paradigm similarly incorporates its trade secrets arguments, once again asserting that Celeritas misconstrues its confidential information as images. Paradigm argues that it is not, as Celeritas suggests, the images contained in its marketing materials or the actual data output that is confidential, but instead, it is the processes used to derive the data output for the Cartridge that is confidential.

The 2003 and 2004 Non-Disclosure Agreements contain identical provisions.  The 2003 contract is a unilateral agreement, identifying Paradigm and the disclosing party and Celeritas as the receiving party of the confidential information.  The 2004 Agreement, however, was executed as a mutual agreement to protect confidential information disclosed by either party.

The 2003 and 2004 Non-Disclosure Agreements specifically define "Confidential Information" as:

> [A]ll information, facts, documents, records, data, drawings, processes, methods, formulae, plans, designs, computer programs and software and other material disclosed or provided to Receiving Party by Disclosing Party, but excluding information: publicly known; generally available to the public; obtained or obtainable by Receiving Party from other sources without violation of any obligation of confidentiality or non-disclosure; or previously known by or disclosed to Receiving Party.[61]

Both agreements also limit the receiving party's use of information qualifying as confidential absent the disclosing party's consent.  Specifically, the agreements provide that "[e]xcept as Disclosing Party authorized in advance, in writing, or as necessary for Receiving Party to perform its work, Receiving Party shall not use, disclose or disseminate any Confidential Information."[62]

---

[61]Doc. 66-2, ¶ 1 (Confidentiality and Non-Disclosure Agreement); Doc. 66-3, ¶ 1 (Mutual Non-Disclosure Agreement).

[62]Doc. 66-2, ¶ 2 (Confidentiality and Non-Disclosure Agreement); Doc. 66-3, ¶ 2 (Mutual Non-Disclosure Agreement).

The "processes" disclosed by one party to another are specifically identified in the Non-Disclosure Agreements as confidential information, and thus, are governed by the agreements. As we noted in subsection (e), Celeritas' patent application for the Cartridge, a product in which Paradigm's processes are incorporated, constitutes "use" of Paradigm's confidential information. Accordingly, based on the evidence presented, a reasonable jury could find that Celeritas breached the parties' 2003 and 2004 Non-Disclosure Agreements by filing its applications for patent regarding the Cartridge. Therefore, we conclude that Paradigm has sufficiently met its burden to withstand summary judgment on these claims (Count I-II).

Paradigm also alleges breach of the parties' Reseller Agreement based on the same conduct, improper use of Paradigm's confidential information, as just discussed with respect to Counts I-II. In addition, Paradigm claims that Celeritas competed with Paradigm during the term of the Reseller Agreement by continuing to prosecute its patent applications, violating the contract's Good Faith provision. The Reseller Agreement contains a Confidentiality provision that covers the confidential information supplied by one party to the other, and incorporates the parties' January 5, 2004 Non-Disclosure Agreement. Therefore, based on the reasoning just discussed with respect to the parties' Non-Disclosure Agreements, we deny summary judgment with respect to this claim. Because we deny summary judgment on this basis, we need not address Paradigm's claim based on the contract's Good Faith provision at this time.

### g. Conversion (Count VIII)

Paradigm alleges that by filing its patent applications, Celeritas assumed and exercised a right of ownership over Paradigm's processes, and sought to exclude Paradigm from owning and using its ideas, information, and patent rights. Celeritas contends that Paradigm's claim fails because it has not provided any evidence that it has been deprived of the use of any of its

information.  Celeritas asserts that rather than showing that it has actually been deprived of use, Paradigm simply alleges hypothetical future restrictions of the software based on the patent applications.  Moreover, Celeritas argues that the patent applications are just that - applications - which have yet to be approved and have not excluded Paradigm from the use of the software.

Paradigm argues that by Celeritas filing the patent applications, it "has taken steps to exclude Paradigm from using its information and ideas," and has reserved Paradigm's confidential information for its exclusive use.[63]  Paradigm further argues that its claim is supported by what it interprets as a "cease-and-desist" letter it received from Celeritas, which provided notice that once the patents issue, Paradigm's efforts to manufacture or distribute the same or similar GIS regulatory compliance tool will put Paradigm at risk for legal action.  Paradigm suggests that based on this evidence, Celeritas has committed conversion under Kansas law, and summary judgment is inappropriate.

Under Kansas law, "[c]onversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."[64]  Intangible, as well as tangible personal property, may be the subject of a conversion claim.[65]  However, for intangible property to be subject to a claim of conversion, it "must be merged

---

[63]Doc. 304, p. 130.

[64]*Bomhoff v. Nelnet Loan Servs., Inc.*, 279 Kan. 415, 421, 109 P .3d 1241, 1246 (2005).

[65]*See Farmers State Bank v. FFP Operating Partners*, 23 Kan. App. 2d 712, 714, 935 P.2d 233, 235, *rev. denied* 262 Kan. 960 (1997).

with tangible property capable of being converted," such as a document.[66] Nonetheless, a party may only commit conversion if such property's use or control precludes its use by another.[67]

Paradigm's conversion claim turns on whether Celeritas' patent application deprived Paradigm from use of the Cartridge.  A patent confers upon the party holding the patent the right to exclude all others from making, using, or selling the protected invention.[68]  And while the rights flowing from the patent do not begin until the date on which the patent issues,[69] Celeritas has taken affirmative steps to obtain a patent by filing the applications.  Celeritas has also assumed the right of ownership, if not a present right, at a minimum a future contingent ownership, as indicated by its February 20, 2007 letter to Paradigm.[70]  The question of whether or not the Patent Office will issue the patent remains, and if such patent does issue, Paradigm would at that time be deprived of the Cartridge's use.  Because an order granting summary judgment in favor of a party acts as a final judgment on the merits,[71] we are reluctant to grant summary judgment at this time, and therefore, deny Celeritas' motion on Paradigm's conversion claim.

---

[66]*Moeller v. Kain*, 2008 WL 4416042, at *5(Kan. Ct. App. Sept. 26, 2008) (citing Restatement (Second) of Torts § 242, comment (1965); 18 Am. Jur. 2d *Conversion* § 7).

[67]*Bomhoff*, 279 Kan. at 421, 109 P.3d at 1246.

[68]*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).

[69]35 U.S.C. § 154(a).

[70]*See* Notice of Celeritas' Intellectual Property Rights (Doc. 272-4).

[71]*McKinzy v. Union Pacific R.R.*, 2009 WL 1033956, at *3 (D. Kan. Apr. 16, 2009).

### e. Computer Fraud and Abuse Act (Count X)

Paradigm alleges that in October 2007, Celeritas violated the Computer Fraud and Abuse Act ("CFAA" or "the Act"), 18 U.S.C. § 1030,[72] by attempting, without authority, to access Paradigm's PDQweb product, which is maintained on a secure computer accessible only through a password-protected Internet portal. Paradigm claims that in response to Celeritas' unauthorized access attempts, it hired an outside consultant to investigate a possible cyber attack and determine whether any damage to their system had occurred.[73] As a result of this investigation, Paradigm incurred a loss in excess of $5000.[74]

Celeritas argues that it is entitled to summary judgment because Paradigm has failed to show that Celeritas' unsuccessful attempt to access Paradigm's website was intentional, unauthorized access, and that damage occurred as a result of that access as required by the CFAA. Celeritas suggests that Paradigm's failure to show any damage to its system, which Paradigm's own expert concedes did not occur, is fatal to Paradigm's claim.

In response, Paradigm argues that, contrary to Celeritas' assertion, it did not specifically bring its claim under a provision of the CFAA requiring it to show damage, but rather, as the Pretrial Order indicates, brought this claim under subsections (a)(2)© and (a)(4) where damage is not an element of proof. Thus, Paradigm contends that it only needs to show that Celeritas' attempted

---

[72]As Paradigm correctly notes, Congress amended 18 U.S.C. § 1030 in September 2008, whereby it altered the substance and numbering of various subsections. Because the 2008 amendment does not applied retroactively, we apply 18 U.S.C. § 1030, *et seq* (2007), the version effective at the time of the alleged acts, to this claim.

[73]"Damage" refers to "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

[74]"Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

access was intentional and unauthorized, and that it suffered a loss exceeding $5000. Paradigm

contends that the deposition testimony of Larry Miley, Celeritas' product manager for the Cartridge,

sets forth sufficient evidence to meet these elements. In Miley's deposition, he admitted that

Celeritas' President, Brett Lester, directed him to attempt access, that his access was not authorized

by Paradigm, and that he intentionally attempted to access Paradigm's secure website by entering

variations of a username and password of one of its customers. Paradigm concedes that at the time,

one of Celeritas' customers did have access to its website; however, Paradigm argues that it did not

authorize Celeritas to access its website. Paradigm contends that this evidence is sufficient to

withstand summary judgment on this claim.

While the CFAA is primarily a criminal statute, it does provide for a private right of action

for violations of some, but not all, of the Act's substantive provisions.[75] Section 1030(g) of the

CFAA provides:

> Any person who suffers damage or loss by reason of a violation of this section may
> maintain a civil action against the violator to obtain compensatory damages and
> injunctive relief or other equitable relief. A civil action for a violation of this section
> may be brought only if the conduct involves 1 of the factors set forth in clause (i),
> (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."[76]

Based on the plain reading of this subsection, it would appear that Section 1030 does not provide

for a private cause of action for the violations Paradigm alleges under subsections (a)(2)© and

(a)(4). However, courts have found that such an interpretation is at odds with the plain language of

---

[75]*Triad Consultants Inc. v. Wiggins*, 249 Fed. Appx. 38, 39 (10th Cir. 2007).

[76]18 U.S.C. § 1030(g).

the statute, which clearly would appear to allow such an action to proceed.[77]  In *Roehrs*, the Fifth

Circuit Court of Appeals explained:

> Section 1030(g) extends the ability to bring a civil action to any person suffering damage or loss under "this section," which refers to § 1030 as a whole, as subsection (g) does not proscribe any conduct itself.  And although § 1030(g) refers to subsection (a)(5)(B), the statute does not limit civil suits to violations of § 1030(a)(5).  Indeed, if Congress intended to limit civil actions in this manner, it could have simply provided that civil actions may only be brought for violations of subsection (a)(5).  Instead, the statute provides that a claim brought under any of the subsections of § 1030 must involve one of the factors listed in the numbered clauses of subsection (a)(5)(B). These factors are:
>
> > (i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
> >
> > (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
> >
> > (iii) physical injury to any person;
> >
> > (iv) a threat to public health or safety; or
> >
> > (v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security ....[78]

This reasoning is consistent with the Tenth Circuit's analysis in *Triad Consultants Inc.*,

where it found a cause of action for a violation under Section 1030(a)(4) proper where the plaintiff

could show that the alleged conduct involved one of the factors in set forth in subsection (a)(5)(B).[79]

---

[77]*See also Fiber Systems Intern., Inc. v. Roehrs*, 470 F.3d 1150, 1157 (5th Cir. 2006); *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 512 (3rd Cir. 2005); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 n.5 (9th Cir. 2004).

[78]*Roehrs*, 470 F.3d at 1157 (citing 18 U.S.C. § 1030(a)(5)(B)).

[79]*Triad*, 249 Fed. Appx. at 39 n.1.

Here, Paradigm claims that Celeritas violated subsections (a)(2)© and (a)(4) when it attempted to access its secure website by using variations of one of its customer's username and password.  Subsection (a)(2)© provides that any person[80] who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer if the conduct involved an interstate or foreign communication" violates the CFAA.[81]  A violation of the Act also occurs under subsection (a)(4) when a person:

> [K]nowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.[82]

Celeritas' arguments focus on Paradigm's inability to prove that Celeritas' access was unauthorized, and that its access attempts resulted in any damage.[83]  Celeritas asserts that one of its customers, Charles Columbus, possessed a valid username and password and gave Celeritas permission to access Paradigm's website, and therefore, its attempted access was authorized.  Celeritas further argues that Paradigm is unable to prove any damage to its website or system, and because damage is a required element, Paradigm's claim fails.  Paradigm, however, has provided evidence that disputes Celeritas' claim that its attempt to access was authorized, and has provided evidence that

---

[80]"Person" means "any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity."  18 U.S.C. § 1030(e)(12).

[81]18 U.S.C. § 1030(a)(2)©).

[82]18 U.S.C. § 1030(a)(4).

[83]Paradigm further asserts that by attempting to access the website, Celeritas exceeded authorized access. The statute defines the term "exceeds authorized access" as "access[ing] a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  Therefore, to exceed authorized access, Celeritas must have been authorized to initially access Paradigm's website, which Paradigm denies, and then accessed the protected computer to obtain or alter information, which again, Paradigm admits did not occur.  As a result, we find this argument without merit.

in response to Celeritas' attempted access, it incurred a loss of $6,015.00 in investigative consultant fees. Contrary to Celeritas' assertions, proving damage is not a required for every claim brought under the CFAA. Therefore, we conclude that Paradigm has set forth sufficient specific facts showing that there is a genuine issue for trial with regard to its CFAA claim, and as a result, we deny summary judgment.

### *Damages*

"To withstand summary judgment, [a] plaintiff must present some evidence from which a jury could find a causal connection between defendant's alleged wrongful conduct and plaintiff's alleged damages."[84] Celeritas contends that the Court should grant summary judgment with respect to Paradigm's claims because it has failed to show that any of Celeritas' alleged conduct caused Paradigm any actual monetary loss, and therefore, has failed to satisfy a required element for each claim.[85] Celeritas also asserts that even if Paradigm could prove causation, its damage calculations are speculative, and therefore, disallowed by law.

Celeritas argues that Paradigm's evidence falls far short of linking any of Celeritas' actions to any harm to Paradigm. Celeritas' arguments focus on Paradigm's actions, or lack thereof, in investigating and developing a Cartridge-equivalent product after the parties' business relationship ended in 2005. Celeritas contends that Paradigm has failed to show that, but for Celeritas' actions, it would or even could have developed a Cartridge-equivalent product in 2005, and then sold that product in 2005, 2006, and 2007. In fact, Celeritas asserts that when their relationship ended, Paradigm had no interest in developing a GIS product similar to the Cartridge, but instead,

---

[84]*Doyle v. Hundley*, 1995 WL 261143, at * 4-5 (D. Kan. Apr. 20, 2005); *see also Wright v. C & M Tire, Inc.*, 545 F. Supp. 2d 1191, 1203 (D. Kan. 2008).

[85]Celeritas does not include Paradigm's CFAA claim within this argument.

developed PDQWeb, which is not a GIS software system, for reasons unrelated to Celeritas' alleged conduct.[86] Celeritas also challenges Paradigm's methods of calculating damages as speculative, and argues that its damages theory based on disgorgement of profits is unfounded.

"Damages need not be established with absolute certainty.  Nevertheless, a damages claim must be supported by evidence that is not conjectural or speculative."[87]  Here, Paradigm has provided sufficient evidence demonstrating that its methods for calculating damages for its claims are not based on such conjecture or speculation so as warrant summary judgment.  While we are cognizant that Paradigm may have some difficulty persuading a jury that it has sustained the damages it alleges, that remains a question for the jury and not one for the Court at this stage of the litigation.

## 2.  Counterclaim Defendant's Motion for Summary Judgment

Celeritas responded to Paradigm's suit by asserting several counterclaims against Paradigm along with one of its owners, Ken Wilkerson.  Celeritas alleges claims of defamation, tortuous interference with contracts, tortuous interference with business expectations, violation of the Lanham Act, breach of contract, and violation of CFAA.  Paradigm and Wilkerson seek summary judgment on all of these claims.  We will address each in turn.

### a. Defamation (Count I)

Celeritas' defamation claim appears to focus on statements allegedly made by Wilkerson, and through him, Paradigm, to ESRI, a company with which Celeritas had been doing business for many years, and the impact those statements had upon Celeritas.  While at an ESRI User's

---

[86]We find Celeritas' argument curious, given that Celeritas sent a letter to Paradigm wherein it indicated its belief that Paradigm's PDQWeb product was sufficiently similar to the Cartridge to potentially impose liability at such time that Celeritas' patent issues.

[87]*Southwind Exploration, LLC v. Street Abstract Co., Inc.*, 209 P.3d 728, 734 (Kan. Ct. App. 2009).

Conference in August 2006, Celeritas alleges that Wilkerson told Steve Kinzy, ESRI's Regional Director, that Celeritas was patenting its linking to ESRI's product, ArcIMS, and as a result of these patents, was suing clients.[88]  Celeritas, however, denies the truth of these statements.  After this conversation, Kinzy relayed Wilkerson's comments to ESRI's Business Partner Program coordinator, Eilene Nettleton-Stanger (Stanger), who, in turn, sent additional emails and had other conversations within ESRI regarding Wilkerson's statements.  Celeritas asserts that as a result of Wilkerson's statements, ESRI chose to not renew Celeritas' membership in its business partner program, damaging its business and reputation in the process.

While ultimately denying that Wilkerson made these statements to ESRI, Paradigm asserts that it is entitled to summary judgment because: (1) Celeritas' only proof of Wilkerson's alleged statements is based on hearsay; (2) Wilkerson's alleged statements were, in some cases, true and privileged, and (3) Celeritas' evidence fails to prove that Wilkerson's statements caused it any damage.  Celeritas, however, has provided more than simply the emails sent by Stanger to support its claims.  For instance, Celeritas has identified Kinzy's deposition testimony in which he indicates that he had a direct conversation with Wilkerson where he made the aforementioned statements.  In addition, Celeritas has provided Stanger's deposition testimony where she testified that Wilkerson told her personally that Celeritas had a patent on ESRI's products.  Therefore, Celeritas has provided sufficient admissible probative evidence supporting its allegations so as to preclude summary judgment on the basis of this argument.

Paradigm also claims that Celeritas has failed to demonstrate it was damaged as a result of Wilkerson's alleged statements.  Celeritas, however, has presented sufficient specific facts showing

---

[88]Celeritas suggests that during this same period, Paradigm was in the process of developing its own web-enabled software, PDQWeb, a software product with which, Celeritas claims, Paradigm intended to compete with the Cartridge, demonstrating a motive for Paradigm in making the defamatory statements.

that there is a genuine issue for trial with regard to damages.  While Paradigm relies on Kinzy's testimony indicating that Wilkerson's statements had no effect on ESRI in terminating the business relationship, Celeritas has provided Stanger's emails setting forth her view as to Celeritas, along with her testimony, indicating that the information ESRI received from Wilkerson impacted ESRI's decision to terminate the relationship.  Once again, we are precluded from granting summary judgment where such genuine issues of material fact exists.

Lastly, Paradigm claims that Wilkerson's statements were privileged,[89] and in some cases, true, thereby warranting summary judgment.  However, because genuine issues of material fact remain concerning the facts, that Paradigm suggests, support its qualified privilege defense, and regarding whether Wilkerson actually made the alleged statements, it would be inappropriate to grant summary judgment at this time.  Therefore, based on the forgoing, we deny Paradigm's request for summary judgment on Celeritas' defamation claim.

### b. Tortuous Interference with Contracts (Count II)

Under Kansas law, for a plaintiff to recover on a tortuous interference with contracts claim, he must show: (1) a contract; (2) the wrongdoer's knowledge thereof; (3) intentional procurement of its breach; (4) absence of justification; and (5) damages resulting therefrom.[90]  Where a plaintiff alleges interference based on defamatory statements, the communication is subject to a qualified privilege which requires plaintiff to prove actual malice by the defendants.[91]

---

[89]Under Kansas law, the essential elements of qualified privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only."  *Knudsen v. Kan. Gas & Elec. Co.*, 248 Kan. 469, 480, 807 P.2d 71, 79 (1991).

[90]*Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 168-69, 872 P.2d 252, 257 (1994); *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130, 151 (2003) (quoting *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106 (1986)).

[91]*Turner*, 240 Kan. at 14, 722 P.2d at 1117.

Paradigm argues that Celeritas has failed to demonstrate that any contract existed in which Paradigm or Wilkerson intentionally procured a breach. Instead, Paradigm argues that ESRI allowed the current agreement between it and Celeritas to expire, and afterwards, decided that it would not renew the agreement. In response, Celeritas suggests that it is the continuation of the agreement that it had with ESRI that Wilkerson and Paradigm interfered, and through Wilkerson's statements, caused ESRI's decision to not renew their business relationship. At no time, however, does Celeritas identify a specific enforceable contract with ESRI that Paradigm caused a "breach," as is required to prove this claim. Rather, Celeritas has put forth argument more akin to an interference with a continued business expectation claim. Thus, because Celeritas has failed to established a genuine issue of material fact with respect to the third element, Paradigm is entitled to summary judgment on Celeritas' claim for tortuous interference with contract.

### c. Tortuous Interference with Business Expectation (Count III)

To prove tortuous inference with a business expectation under Kansas law, a party must prove: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct.[92]   In

---

[92]*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo., Inc.*, 431 F.3d 1241, 1262-63 (10th Cir. 2005) (citing *PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1488, 1498 (D. Kan. 1996)).

addition, the claimant "must demonstrate that the defendant acted with malice,"[93] which the Kansas Supreme Court has defined as acting "with actual evil-mindedness or specific intent to injure."[94]

As already discussed, Celeritas alleges that Paradigm interfered with the business relationship it had with ESRI, along with several other of its customers.  Celeritas contends that but for Paradigm's interference (i.e., Wilkerson's alleged untrue statements to Kinzy), ESRI would not have removed Celeritas from its business partner program, and ESRI would have renewed their relationship as it had in past years.  Paradigm, however, disagrees, arguing that as Kinzy testified, ESRI's decision not to renew Celeritas as a business partner was because the relationship failed to bring any financial value to ESRI, and had nothing to do with any statements made by Wilkerson. Paradigm does not dispute that it knew Celeritas was a member of ESRI's business partner program, but disagrees with Celeritas' contention that ESRI would have continued the business relationship absent any statements by Wilkerson, which vitiates Celeritas' claim for damages.  However, as previously discussed, Celeritas posits that Kinzy's and Stanger's testimony, indicates otherwise. As a result, we find that Paradigm has failed to show the absence of a genuine issue of material fact, and therefore, is not entitled to summary judgment.[95]

### d. False Advertising and Commercial Disparagement in Violation of the Lanham Act (Count IV)

Celeritas' claim under section 43(a) of the Lanham Act[96] focuses on a press release related to this lawsuit that Paradigm posted on its website.  Celeritas contends that by Paradigm posting the

---

[93]*Id.* at 1263 (citing *L & M Enters., Inc., v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000)).

[94]*Turner*, 240 Kan. at 8, 722 P.2d at 1113.

[95]Because Celeritas' claim survives summary judgment on this basis, we need not address its remaining allegations relating its tortuous interference with business relations at this time.

[96]15 U.S.C. § 1125(a).

press release on its website, it repeated the false claims alleged in its petition, and falsely claimed

it had ownership in the web-based public awareness technology developed by the parties along with

any patents related to such technology.  Celeritas further alleges that Paradigm's press release

planted "doubt in the minds of the consumer about Celeritas" and its product in an attempt to bolster

its own PDQWeb sales.[97]  Paradigm contends that summary judgment is appropriate because its

press release does not constitute a "commercial advertising or promotion" under the Lanham Act,

nor does it concern the "nature, characteristics, qualities, or geographic origin" of either parties'

products, as required by the Act.

> The Lanham Act provides a cause of action when:
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.[98]

Thus, to succeed on its claim, Celeritas must prove that, through the press release, Paradigm: (1)

made material false or misleading representations of fact in connection with the commercial

advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion

---

[97]Doc. 305, p. 68.

[98]15 U.S.C. § 1125(a).

or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the

characteristics of the goods or services; and (4) injure the plaintiff.[99]

After reviewing Paradigm's press release, we conclude that, contrary to Celeritas'

contentions, it does not make any material false or misleading representations of fact in connection

with the commercial advertising or promotion of its products. Paradigm's press release, titled "The

Paradigm Alliance Sues Celeritas Technologies for Trade Secret Misappropriation," reads:

> The Paradigm Alliance, Inc. (Wichita, Kansas and Houston, Texas) has sued Celeritas Technologies, LLC and Celeritas Works, LLC (both Overland Park, Kansas) for misappropriation of Paradigm's trade secrets and other confidential information. Filed March 29, 2007, in the District Court of Sedgwick County, Kansas, the lawsuit makes the following allegations: Celeritas entered into a confidential business relationship with Paradigm in October 2003 to develop web-based public awareness technology for the oil and gas industry; believing itself protected by a series of nondisclosure agreements, Paradigm shared its confidential information with Celeritas, and worked closely with Celeritas to implement web-based capability; at this very time, however, Celeritas secretly incorporated Paradigm's confidential information into U.S. Patent Applications in which Celeritas claims exclusive rights to and ownership of the technology; the first such patent application, filed February 19, 2004–not even four months after the start of the relationship–was not made public until January of this year.
>
> Paradigm seeks money damages in excess of $75,000, an injunction prohibiting Celeritas from further misuse of Paradigm's confidential information, a judgment that Paradigm has ownership in the technology and in any patents or other rights that may issue, as well as other relief. Paradigm asks that a Sedgwick County jury hear the case.[100]

Paradigm contends that the press release concerns only the lawsuit, and not either parties'

product. We agree. Celeritas arguments relating to its Lanham Act claim appear to be based not

on the actual text of the press release, but instead, focus on the substance of the claims Paradigm

alleges in its lawsuit. Celeritas primary argument is that because the allegations are false, the press

---

[99]*Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002).

[100]Paradigm Press Release (Doc. 281-16).

-43-

release is false advertising, thereby violating the Lanham Act.  Paradigm's press release, however, does nothing more than give notice that it had filed suit, and identifies what it had alleged in its lawsuit against Celeritas.  As indicated in the press release, Paradigm filed the lawsuit, as stated, and it did in fact make the allegations as set forth in the release.  Moreover, we note that Paradigm explicitly indicated that "the lawsuit makes the following allegations," in the press release prior to identifying its contentions, which once again, is not a misrepresentation of the lawsuit.   Whether Paradigm is able to adequately prove the allegations to a jury at trial so as to obtain a verdict in its favor is irrelevant with regard to our analysis on this issue.  Therefore, because we conclude that Paradigm's press release contains no material false or misleading representations of fact in connection with the commercial advertising or promotion of its products, Paradigm is entitled to summary judgment on this claim.  Accordingly, we need not address the remaining elements.

### e. Breach of Contract (Count V)

In February 2005, Celeritas and Paradigm executed a Reseller Agreement in which the parties agreed became effective December 2004.  As part of this agreement, the parties identified their business relationship as follows:

> Paradigm and Celeritas are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative or employment relationship between the parties.  The parties will have no authority to make or accept any offers or representations on the others behalf.[101]

Celeritas contends that by filing the instant lawsuit claiming that the parties were in a joint venture to develop the Cartridge, Paradigm breached the Reseller Agreement.  Paradigm does not dispute that the Reseller Agreement correctly identifies the parties' relationship as one of independent contractors, but argues that the Reseller Agreement clearly indicates that its provisions apply from

---

[101]Reseller Agreement (Doc. 66-4).

its effective date forward.  There is no provision applying any of the contract's promises or statements to any conduct or agreements of the parties prior to December 2004.  Paradigm also asserts that there is nothing in the contract that prevents a party from bringing a lawsuit to settle claims, and therefore, it has not breached the Reseller Agreement.  We agree.

To prove its claim for breach of contract under Kansas law, a plaintiff must prove by a preponderance of the evidence that: (1) there was a contract between the parties; (2) there was sufficient consideration to support the contract; (3) the plaintiff was willing to comply with the terms or did comply with the terms of the contract; (4) the other party breached the contract; and (5) plaintiff sustained damages.[102]

After a careful review of the Reseller Agreement, we find that its provisions are unambiguous and do not support Celeritas' claim.  The agreement, effective in December 2004, contains no language indicating that the contract applies to any conduct or agreements of the parties prior to that date, other than relating to maintaining the confidentiality of any confidential information exchanged between the parties during the Cartridge's development.  In fact, Paradigm does not dispute that the parties were independent contractors from the Reseller Agreement's effective date, but bases its claims on conduct and agreements between the parties before this contract became effective.  In addition, neither party contractually promised to refrain from initiating a lawsuit to settle any disagreement, but instead, apparently anticipating the possibility of litigation, included a provision that entitles the successful or prevailing party in an action to recover its reasonable attorneys' fees, court costs, and all expenses incurred in that action or proceeding.  We

---

[102]*City of Andover v. Sw. Bell Tel., L.P.*, 37 Kan. App. 2d 358, 362, 153 P.3d 561, 565 (2007) (citing PIK Civ. 3d 124.01).

-45-

therefore find that Celeritas' breach of contract claim is without merit, and Paradigm is entitled to summary judgment.[103]

### f. Violation of Computer Fraud and Abuse Act (Count VI)

Celeritas alleges that Paradigm violated the CFAA by accessing or attempting to access its non-public website after the parties terminated the Reseller Agreement in 2005. Paradigm moves for summary judgment on Celeritas' CFAA claim arguing that Celeritas has brought forth no evidence that Paradigm accessed one of its protected computers, or more importantly, sustained any damage or loss as a result. In response, Celeritas does not dispute Paradigm's assertions, and admits that it has no evidence that it incurred any damage. Celeritas has failed to address the issue of loss, nor did it provide any evidence of any loss. Instead, Celeritas argues that neither party has any evidence of damages, and argues that because the circumstances of each party are similar, each party's claim should be dismissed.

Contrary to Celeritas' assertions, Paradigm presented evidence of the actual loss it incurred from responding to Celeritas' alleged attempted access, and provided testimony and other evidence, including expert witness testimony, in support of its CFAA claim sufficient to withstand summary judgment. Celeritas, however, has provided no evidence to support its claim, but simply restates generally its allegations, which is insufficient to withstand summary judgment.[104] Indeed, Celeritas

---

[103]The Court notes that Celeritas also argues in its Response that Paradigm breached the implied duty of good faith and fair dealing it owed Celeritas under the Reseller Agreement by providing improperly licensed data for use by Celeritas in the Cartridge, and on March 30, 2009, after the instant motion was briefed, moved to supplement the Pretrial Order to add this claim. *See* Doc. 279. Therefore, Celeritas' breach of contract claim based on implied duty of good faith and fair dealing claim is not properly before the Court in this motion and will not be addressed. We will address that claim when ruling on Celeritas' motion to supplement.

[104]*See Anderson*, 477 U.S. at 256 (The party opposing a motion for summary judgment may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations).

"concedes it is unable to muster the facts to support a claim against Paradigm under the CFAA."[105]
Therefore, Paradigm has met its burden of showing that there is no genuine issue as to a material fact
with this claim and is entitled to summary judgment.

### IV. Conclusion

Based on the foregoing, Celeritas' Motion for Summary Judgment is GRANTED with
respect to Paradigm's claims of Fraud by Promise of Future Events claim (Count V), and Fraud by
Inducement (Count VII). Celeritas' Motion for Summary Judgment is DENIED with respect to the
following of Paradigm's claims: Breach of Contract (Counts I-III); Breach of Fiduciary Duty and
Duty of Good Faith and Fair Dealing (Joint Venture) (Count IV); Fraud by Silence (Count VI);
Conversion (Count VII); Misappropriation of Trade Secrets (Count IX); and Computer Fraud and
Abuse Act (Count X).

Paradigm's and Ken Wilkerson's Motion for Summary Judgment is GRANTED for the
following of Celeritas' counterclaims: Tortious Interference with Contracts (Count II); False
Advertising and Commercial Disparagement in Violation of the Lanham Act (Count IV); Breach
of Contract (Count V); and Violation of Computer Fraud and Abuse Act (Count VI). Paradigm's
and Ken Wilkerson's Motion for Summary Judgment is DENIED with respect to Celeritas' claims
for Defamation (Count I) and Tortious Interference with Business Expectations (Count III).

Accordingly,

**IT IS THEREFORE ORDERED** that Counter-Defendants The Paradigm Alliance, Inc.,
and Ken Wilkerson's Motion for Summary Judgment (Doc. 259) is hereby GRANTED in part and
DENIED in part.

---

[105]Celeritas' Reply Memorandum (Doc. 310, p. 29).

**IT IS FURTHER ORDERED** that Defendants Celeritas Technologies, LLC and Celeritasworks, LLC's Motion for Summary Judgment (Doc. 261) is hereby GRANTED in part, and DENIED in part.

**IT IS SO ORDERED.**

Dated this 22nd day of September, 2009, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE