# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE PARADIGM ALLIANCE, INC.,

    *Plaintiff/Counterclaim Defendant*,

vs.

        Case No. 07-1121-EFM

CELERITAS TECHNOLOGIES, LLC, and
CELERITASWORKS, LLC

    *Defendant/Counterclaim Plaintiff*,

vs.

KEN WILKERSON,

    *Third Party Defendant.*

## MEMORANDUM AND ORDER

Plaintiff The Paradigm Alliance, Inc. ("Paradigm") commenced this action against Defendants Celeritas Technologies, LLC and Celeritasworks, LLC (collectively "Celeritas"), alleging numerous claims, including breach of contract, breach of fiduciary duty and fair dealing arising from a joint-venture business relationship, fraud by silence, conversion, misappropriation of trade secrets, and violation of the Computer Fraud and Abuse Act. In answering, Celeritas asserted several counterclaims against Paradigm and third party defendant Ken Wilkerson, alleging claims of defamation, tortuous interference with contracts, tortuous interference with business expectations, violation of the Lanham Act, breach of contract, and violation of the Computer Fraud

and Abuse Act.[1]  Prior to trial, the Court dismissed on summary judgment Paradigm's claims of fraud by promise of future events and fraud by inducement, and dismissed all but Celeritas' defamation and tortious interference with business expectation counterclaims.  The case proceeded to trial for the parties' remaining claims on November 30, 2009.  At the close of Celeritas' evidence, Paradigm and Wilkerson moved for judgment as a matter of law on Celeritas' counterclaims, which the Court granted.  The jury returned a verdict in Paradigm's favor.

Now before the Court are Celeritas' Motion for New Trial Regarding their Counterclaims (Doc. 497), Renewed Motion for Judgment as a Matter of Law (Doc. 505), and Motion for New Trial and/or to Alter or Amend the Current Judgment (Doc. 507).  Also before the Court is Paradigm's Motion to Modify, Alter, or Amend the Judgment to Add Declaratory Relief and a Constructive Trust (Doc. 503).  The Court will address each in turn.

1.      **Celeritas' Motion for New Trial Regarding their Counterclaims (Doc. 497)**

At the close of Celeritas' evidence, Paradigm and Wilkerson moved for judgment as a matter of law as to both of Celeritas' counterclaims.  After hearing argument, the Court granted Paradigm's and Wilkerson's motion, dismissing Celeritas' claims for defamation and tortious interference with business expectation.  Celeritas now moves for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure on these counterclaims.  The basis of their motion is that the Court erred by failing to construe the evidence and inferences in a light most favorable to Celeritas, weighed the credibility of Celeritas' principal witness as to its counterclaims, and substituted its own judgment for that of the jury in ruling that Celeritas failed to demonstrate that it was damaged by Paradigm's and Wilkerson's alleged defamatory statements.  For the following reasons, we deny the motion.

---

[1]The Court has previously written a number of orders in this case that set forth the factual background of the parties' claims.  The Court incorporates this factual background to the extent it is relevant to the instant motion.

A motion for new trial under Rule 59(a) is committed to the sound discretion of the trial court.[2] Such a motion is " 'not regarded with favor and should only be granted with great caution.' "[3] A motion for new trial should not be granted unless " 'the court believes the verdict is against the weight of the evidence, prejudicial error has occurred, or substantial justice has not been done.' "[4] It is the moving party's burden to demonstrate trial error which constitutes prejudicial error.[5] In reviewing a motion for new trial, the Court must view the evidence in the light most favorable to the prevailing party.[6]

Celeritas argues that during trial, they submitted evidence from which the jury could have found that Wilkerson made the alleged defamatory statements. Specifically, Celeritas asserts that certain emails of Eilene Nettleton-Stanger, along with entries she made into ESRI's Pivotal system, proved that the defamatory statements Wilkerson made to Steve Kinzy caused Celeritas' termination from ESRI's business partner program. While Celeritas agrees that this evidence is hearsay, they contend that it is nonetheless admissible because neither Paradigm nor Wilkerson objected to its admission at trial. As a result, Celeritas suggests that there existed sufficient question so that the Court should have permitted their counterclaims to go to the jury.

The issue is not whether Stanger's emails and Pivotal entries were admissible, but whether the evidence presented was so speculative that there was no legally sufficient basis for a jury to find in favor of Celeritas on their counterclaims. The only evidence that controverted Kinzy's testimony

---

[2]*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

[3]*Wirtz v. Kansas Farm Bureau Servs., Inc.*, 311 F. Supp. 2d 1197, 1226 (D. Kan. 2004) (citation omitted).

[4]*Id.*

[5]*White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir. 1983).

[6]*Griffin v. Strong*, 983 F.2d 1544, 1546 (10th Cir. 1993).

was speculative and unreliable, and the Court is not required to submit such evidence to the jury. As the Tenth Circuit has recognized,

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.[7]

Stanger, who was neither present nor a party to Kinzy's conversation with Wilkerson, relied on Kinzy as the source for both her emails and the Pivotal time entries. Kinzy, who had the actual conversations with Wilkerson, and thereafter, Stanger, disagreed with the accuracy of Stanger's entries and testified that Wilkerson did not make the statements to which Stanger attributed to him. Stanger's testimony failed to provide any reliability to her entries, which are clearly speculative in nature. As a result, because Celeritas' evidence relating to Stanger's emails and Pivotal time entries merely rest upon speculation, the Court was not required to submit that evidence to the jury.

Kinzy further testified that neither Wilkerson nor Paradigm contributed to ESRI's decision to terminate Celeritas from its business partner program, and in fact, he had recommended Celeritas' termination from the program after a 2006 evaluation due to Celeritas' failure to provide financial or strategic value to the program. Stanger's emails do nothing to controvert Kinzy's testimony that, notwithstanding any alleged statements by Wilkerson or Paradigm, Celeritas would have been terminated from ESRI's program. Celeritas failed to present any evidence to demonstrate that, as a result of any alleged defamatory conduct by either Paradigm or Wilkerson, its relationship with ESRI was affected in ways that would not otherwise have been affected absent the alleged conduct. Therefore, judgement as a matter of law on their counterclaims was appropriate.

---

[7]*Dillon v. Fibreboard Corp.*, 919 F.2d 1488, 1490 (10th Cir. 1990) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958)).

Paradigm and Wilkerson also suggest that granting a new trial based on Celeritas' hearsay evidence would be futile. They contend that their lack of objection at trial does not preclude them from asserting their objection to the admission of this hearsay evidence in a future trial or moving for summary judgment, and as Celeritas' counsel agreed, without this evidence, their counterclaims fail. Interestingly, Celeritas argues that Paradigm's and Wilkerson's failure to object to this admission of hearsay evidence became a stipulation, and therefore, neither is permitted raise objection in the future. This argument is without merit. A party does not "stipulate," or admit to the facts contained in any particular piece of evidence simply because they choose not to object to its admission into evidence. As Wilkerson's counsel indicated, it was a strategic decision made for *this* trial, as nowhere in the record does either party make any express or implied admission relieving Celeritas from proving any particular set of facts contained within either Stanger's emails or her Pivotal system entries. Therefore, neither Paradigm nor Wilkerson would be precluded, as Celeritas suggests, from raising an objection to Celeritas' attempt to admit this hearsay evidence in a future trial.

Celeritas also argues that the Court erred by ruling that the jury could not legally conclude that Celeritas was damaged by the change in the tenor of their relationship with ESRI. Celeritas asserts that during trial, it provided sufficient evidence concerning damages that related to it's termination from ESRI's business partner program, and as a result, whether it was damaged became a question for the jury and not the Court. They further contend that they were not required to demonstrate actual out-of-pocket expenses to prove damages, and thus, the fact that they have yet to spend the approximate $750,000 to change their primary GIS software vendor to someone other

than ESRI is inapposite to the question of damages. Based on this error, Celeritas claims a new trial is required.

Paradigm and Wilkerson contend that the evidence presented at trial proves that Celeritas suffered no damage as a result of being terminated from the business partner program with ESRI. They argue that Celeritas' CEO, Rob Cossins, testified that the only damages Celeritas was claiming was related to the costs they would incur in converting their GIS software over to another vendor, which are costs that would not be incurred if Celeritas chose not to migrate to another GIS software solution and remain with ESRI. Paradigm and Wilkerson claim that because it is Celeritas' choice to migrate to another software vendor, they are creating their own damages and have shown no harm that directly results from any statements or actions of Paradigm or Wilkerson.

Relying on *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,[8] Celeritas asserts that they need not show actual out-of-pocket loss to prove that they were damaged. Although Celeritas is correct in that assertion, they must still prove that they were actually damaged and may not rely on damages that are presumed.[9] Celeritas suggests that the documentary, uncontradicted evidence introduced at trial proves that its business partner agreement with ESRI was not renewed, and this fact alone creates a question for the jury in which it should have decided whether Celeritas was in fact damaged by that termination. In *Sunlight Saunas*, a seller of saunas sued one of its competitors, in part, for defamation and false advertising. During trial, the seller testified and produced evidence of lost sales, calls from customers concerned about topics raised by the defendant's conduct, its

---

[8]442 F. Supp. 2d 1160 (D. Kan. 2006).

[9]*See id.* at 1167 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)); *see also Wright v. Bachmurski*, 29 Kan. App. 2d 595, 600, 29 P.3d 979, 984 (2001) (citing *Zoeller v. Am. Family Mut. Ins. Co.*, 17 Kan. App. 2d 233, 228, 834 P.2d 391, *rev. denied* 251 Kan. 942 (1992)).

failed sales goals, and canceled purchase contracts, all the result of defendant's alleged defamation and false advertising. Evidence was also presented in which sales occurring both before and after the conduct were compared, showing a decrease in revenue after defendant's alleged conduct. In addition, the seller presented testimony and evidence concerning the time spent by management dealing with "disgruntled and confused customers, some of whom questioned [the seller's] reputation."[10]

Celeritas compares the evidence presented in *Sunlight Saunas* to that of their own presented at trial, suggesting it illustrates prejudicial error. Specifically, Celeritas contends that they established damages through testimony proving that the business partner agreement between Celeritas and ESRI was terminated, and immediately after receiving notice of that termination, Celeritas feared its systems would stop functioning. Celeritas further claims their attempts to contact ESRI by email, telephone, and letters to gain information to alleviate this fear went unanswered. As a result, Celeritas asserts they lost confidence in ESRI, and thus, are now forced to transfer their applications to non-ESRI vendors. Celeritas claims this transfer will cost approximately $750,000 when they can afford to complete the migration.[11]

Contrary to Celeritas' assertion, the evidence they presented at trial failed to prove that they were damaged by any defamatory conduct of either Paradigm or Wilkerson. While it is true that ESRI at one point terminated Celeritas from its business partner program, Celeritas did not provide any evidence of how that termination caused them damage. Instead, Celeritas presented testimony showing how Celeritas thought they might be damaged, such as experiencing an interruption in

---

[10]*Sunlight Saunas*, 442 F. Supp. 2d at 1167-68.

[11]Celeritas contends that they have not been able to complete the migration to another vendor because of the legal costs it has incurred in defending this lawsuit and prosecuting its counterclaims.

software functionality. However, no such stoppage occurred. In addition, Celeritas suggests that they were damaged simply by the fact that ESRI terminated their membership in the business partner program. But as the Court indicated in its comments at trial, the evidence demonstrated that the termination did nothing to alter Celeritas' current business process, and in fact, Celeritas continued to operate using ESRI's product as they had when they were a member of the business partner program. The only evidence concerning damages that Celeritas alleged were a result of any defamatory conduct by either Paradigm or Wilkerson was the cost Celeritas *would incur* in the future in migrating to another vendor – an action that was the result of *Celeritas'* loss of confidence in ESRI due to ESRI's conduct rather than any conduct of Paradigm or Wilkerson. In contrast to the plaintiff in *Sunlight Saunas*, Celeritas provided no evidence of lost or decreased business or damage to their reputation with customers, or fielded or spent any time responding to complaints or concerns by their customers regarding Celeritas' reputation, nor did they provide any other evidence to show how the business or its reputation was negatively affected.

A plaintiff alleging defamation must prove actual damages that resulted from the defendant's conduct.[12] Celeritas has failed to present evidence whereby a jury could legally conclude that Celeritas was damaged by Paradigm's or Wilkerson's alleged defamatory conduct, or that their business agreement with ESRI would not have been terminated absent this conduct. Therefore, we deny Celeritas' motion.

## 2.    Celeritas' Renewed Motion for Judgment as a Matter of Law (Doc. 505).

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Celeritas renews their motion for judgment as a matter of law previously made under Rule 50(a) at the close of Paradigm's

---

[12]*Wright*, 29 Kan. App. 2d at 600, 29 P.3d at 984.

evidence at trial.  A post-trial motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b)

is appropriate only if the evidence, viewed in a light most favorable to the nonmoving party, "points

but one way and is susceptible to no reasonable inferences supporting the party opposing the

motion."[13]  Such a motion should be "cautiously and sparingly granted."[14]  In determining whether

judgment as a matter of law is proper, the Court may not weigh the evidence, consider the credibility

of witnesses, or substitute its judgment for that of the jury.[15]  Rather, the Court must affirm the jury

verdict if, viewing the record in a light most favorable to the nonmoving party, it contains evidence

upon which the jury could have properly returned a verdict for the nonmoving party.[16]  The Court,

however, must enter judgment as a matter of law on behalf of the movant if " 'there is no legally

sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law.' "[17]

### a. Joint Venture

Celeritas moves for judgment as a matter of law on Paradigm's breach of fiduciary duty

claim, arguing that during trial, Paradigm failed to present clear and convincing evidence that it and

Celeritas entered into a joint venture.  Celeritas first asserts that Paradigm failed to provide any

evidence that they shared profits, and absent such a showing, there could be no joint venture

relationship.  They further assert that Mark Allen's testimony that a joint venture existed failed to

---

[13]*Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir. 2002) (quoting *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999)).

[14]*Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir. 2001) (quoting *Weese v. Schukman*, 98 F.3d 542, 548 (10th Cir. 1996)).

[15]*Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir. 2001).

[16]*Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219-20 (10th Cir. 1999).

[17]*Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546-47 (10th Cir. 1996)).

meet the clear and convincing standard, and as a result, judgment as a matter of law is required for this claim.

### 1. Sharing of Profits

Celeritas contends that Paradigm failed to present clear and convincing evidence that a joint venture relationship existed between the parties. Relying on *PulseCard, Inc. v. Discover Card Services, Inc.*,[18] Celeritas first argues that for a joint venture to exist, the parties must have agreed to share profits, and absent such an agreement, the existence of a joint venture was not "highly probable."[19] Celeritas suggests that rather than proving a joint venture, the evidence demonstrated that the parties entered into an arms-length business relationship for mutual profit and not one where they shared profits. In support, Celeritas points to Mark Allen, who testified that Paradigm never shared profits with Celeritas because they had agreed to share at the revenue level, not the profit level. Celeritas argues that this evidence makes clear that they never entered into an joint venture or agreed to share profits. Celeritas also asserts that the parties agreed to pay each other a percentage on sales instead of sharing profits, i.e., a commission, and this fact, along with the parties' subsequently entering into a Reseller Agreement, is inconsistent with a joint venture.

In addition to the foregoing, Celeritas argues that the actual operation of the business demonstrates that there was no joint venture. Celeritas asserts that the evidence presented at trial clearly showed that Paradigm had no access to the software code, and in fact, the code and passwords were exclusively controlled by Celeritas. Celeritas contends there was no evidence

---

[18]917 F. Supp. 1488 (D. Kan. 1996).

[19]To meet the burden of proof by clear and convincing evidence, Paradigm must establish that "the truth of the facts asserted is highly probable." *See Almon v. Goodyear Tire & Rubber Co.*, 2009 WL 1421199, at *11 (D. Kan. May 20, 2009) (quoting *In re B.D.-Y.*, 286 Kan. 686, 687, 187 P.3d 594, 602 (2008)).

showing joint ownership of any business assets, no joint employees, and no joint agreement fixing any salaries. Celeritas finally argues that, even more importantly, there was no winding down of the alleged joint venture and no discussion of or payment of compensation by Celeritas to Paradigm for its interest, making it impossible to conclude that a joint venture was highly probable.

Relying on *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*,[20] Paradigm asserts that Kansas law does not require that business entities agree to share profits in order to form a joint venture. Instead, whether or not profits are shared is but one factor to consider in determining whether a joint venture exists.[21] Nevertheless, Paradigm argues that the evidence proved that it did enter into a joint venture with Celeritas for a profit, as Paradigm shared in the revenues generated from all but one sale of the Cartridge. Paradigm points to the testimony of both Hal Bentley, Celeritas' sales manager, and Paradigm's President, Mark Allen, who each stated that Paradigm and Celeritas entered into the business relationship to sell the Cartridge to make a profit. Paradigm suggests that such testimony from both sides is clear and convincing evidence that this was a for-profit venture.

Paradigm also argues that the testimony of Celeritas' own President, Brett Lester,[22] proves the existence of a joint venture. First, Paradigm suggests that during his testimony, Lester failed to controvert Allen's testimony as to their October 16, 2003 conversation in which Lester allegedly offered to partner with Paradigm to co-own, develop, sell, and market the Cartridge, and in fact, Celeritas' counsel failed to elicit any testimony from Lester regarding that conversation. Paradigm

---

[20]226 Kan. 70, 596 P.2d 816 (1979).

[21]*Id.* at 76, 596 P.2d at 823; *see also* Kan. PIK Civil 4th § 107.26.

[22]At all relevant times, Brett Lester was either Celeritas' President or its Vice President and General Manager.

contends that while Celeritas may now dispute the existence of a joint venture between the parties, the evidence presented proves that it and Celeritas did in fact intend, and expressly agreed at the beginning of their relationship, to enter into a joint venture to create the Cartridge. Paradigm suggests this fact is demonstrated by the Partnering Document Lester himself drafted, which also corroborates Allen's testimony. Paradigm contends that this Partnering Document accurately describes the relationship entered into with Celeritas, which is a description that meets the definition of a joint venture:

> The partnership between Paradigm and Celeritas is to help both companies penetrate and/or expand their business in the Pipeline marketplace. The two companies believe that by combining their collective assets, skills, and abilities that they can better serve the Pipeline marketplace and therefore grow their respective business.[23]

Paradigm asserts that, in addition to the Partnering Document, the lack of testimony rebutting Allen's statements allows the reasonable inference that Allen's testimony was accurate. Further, Paradigm asserts that because Allen's testimony was clear and unrebutted, it was convincing evidence that, coupled with all the other evidence presented, including the Partnering Document, the parties intended, and in fact did, enter into a joint venture with respect to the development and sale of the Cartridge.

When viewing the evidence in the light most favorable to Paradigm, the non-moving party, the Court cannot agree with Celeritas that Paradigm failed to present evidence sufficient to support the jury's finding that Paradigm and Celeritas were engaged in a joint venture.

---

[23]Doc. 522, p.14 (Paradigm's Response in Opposition, citing Paradigm Trial Ex. 111).

In Kansas, a joint venture exists where two or more corporations associate to carry out a single business enterprise for profit.[24] When the existence of a joint venture is controverted, one can be found through the mutual acts and conduct of the parties.[25] In determining whether a joint venture exists, courts generally look to five, non-dispositive factors: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement.[26]

Here, Allen testified that he had a conversation with Lester in October 2006 in which they discussed partnering with each other to develop and sell a community awareness solution. Thereafter, Lester drafted a Partnering Document wherein he indicated that their goal was to "outline an agreement that will detail the **'mutual'** expectations, restrictions, and covenants between [Celeritas and Paradigm]."[27] The Partnering Document further represented that "[t]he partnership between Paradigm and Celeritas is to help both companies penetrate and/or expand their business in the Pipeline marketplace. The two companies believe that by combining their collective assets,

---

[24]*Modern Air Conditioning*, 226 Kan. at 75, 596 P.2d at 822. The following instruction was submitted to the jury: "A joint venture is an association of two or more persons or corporations to carry out a single business enterprise for profit for which purpose they combine their efforts, property, money, skill and knowledge." Doc. 479, p. 13.

[25]*Pulsecard*, 917 F. Supp. at 1485; *George v. Capital South Mortgage Invs., Inc.*, 265 Kan. 431, 448, 453, 961 P.2d 32, 44, 47 (1998) ("The existence of a joint venture may be *inferred* from the facts and circumstances presented at the trial which demonstrate that the parties, in fact, undertook a joint enterprise."); *Modern Air Conditioning*, 226 Kan. at 77, 596 P.2d at 823.

[26]*Cuiksa v. Hallmark Hall of Fame Prod. Inc.*, 252 F. Supp. 2d 1166, 1179 (D. Kan. 2003) (citing *Modern Air Conditioning*, 226 Kan. at 75, 596 P.2d at 822; *see also Asia Strategic Inv. Alliances, Ltd. v. Gen. Elec. Capital Servs., Inc.*, 1998 WL 811606, at *5 (10th Cir. Nov. 24, 1998) (none of the factors listed as indicative of a joint venture are singularly controlling).

[27]Trial Ex. 111 (emphasis in original).

skills, and abilities that they can better serve the Pipeline marketplace and therefore grow their respective business."[28]

When questioned by Paradigm's counsel regarding the Partnering Document, Lester agreed that the document was a fair representation of Celeritas' relationship with Paradigm in 2003 and 2004, and it was the result of the agreement he and Allen reached as a result of their initial October 2003 discussion. Evidence was also presented at trial indicating that, although there was no pooling of funds, Paradigm and Celeritas shared expenses related to both the Cartridge's development and advertising, combined their skills, knowledge, business processes, and manpower to develop the Cartridge, shared control over pricing, and shared responsibility for determining the product's requirements during development.[29] In addition, Paradigm and Celeritas shared revenues received from sales of the Cartridge. Although the evidence showed that the parties did not share financially at the profit level, Paradigm and Celeritas agreed to share at the revenue level, and witnesses from both parties testified that both Paradigm and Celeritas intended to make a profit through the joint development and sale of the Cartridge. The evidence further demonstrated that the parties shared expenses, and while there was no joint pooling of funds to pay expenses, the parties coordinated payment of expenses as they were incurred on the project. Also important is the lack of any evidence showing that Celeritas treated Paradigm as a customer. There was no evidence indicating that Celeritas ever sent Paradigm any invoices or sold any product to Paradigm. Advertising

---

[28]*Id.*

[29]Celeritas suggests that by later testifying during cross-examination that they and Paradigm were not partners, that they never shared profits, losses, or expenses, and that it was never suggested that they were each 50% owners of the Cartridge, Lester undermined both Allen's testimony and the language in the Partnering Document to such degree that it was not possible for a jury to legally conclude that a joint venture was highly probable. Such argument, however, relates to the credibility of these two witnesses. A jury finding Allen's testimony more credible, coupled with the language in the Partnering Document and other evidence, could legally conclude that it was highly probable that Celeritas and Paradigm entered into a joint venture.

depicted the parties' relationship as an alliance, and coupled with the handshake logo presented within their advertising, indicates that Celeritas looked upon Paradigm as more than a customer, simple reseller, or another "business partner," as that term was used when describing Microsoft or other similar entities. Therefore, the Court concludes that, viewed in the light favorable to Paradigm, sufficient evidence was presented at trial to permit a jury to legally conclude that Paradigm and Celeritas entered into a joint venture. Accordingly, Celeritas is not entitled to judgment as a matter of law on this claim.

### b. Breach of Fiduciary Duty

Celeritas claims that even if a joint venture and its attendant fiduciary duty existed between them and Paradigm, Paradigm failed to prove that Celeritas breached any such duty. Celeritas argues that Paradigm's only claim for breach of fiduciary duty stems from Celeritas' filing of a patent application. Celeritas contends that because the filing took place after the joint venture terminated,[30] there can be no breach of any fiduciary duty because any such duty terminated with the joint venture. Celeritas does concede that it submitted a provisional patent application to the U.S. Patent and Trademark Office within the timeframe Paradigm claims the joint venture existed; however, they argue that the application filed was done so in the name of two of its employees, who were the actual inventors, and not in the name of Celeritas. Celeritas argues that not until after the alleged joint venture terminated did its employees assign the provisional patent application to Celeritas, and accordingly, Celeritas breached no fiduciary duty during the alleged joint venture. Similarly, Celeritas argues that because they did not file the non-provisional patent application for the Cartridge until nearly two months after the joint venture terminated, there was no longer any

---

[30]Allen testified at trial that when he signed the Reseller Agreement on February 22, 2005, which was dated effective on December 20, 2004, the joint venture between Paradigm and Celeritas terminated.

duty to breach. Accordingly, Celeritas contends that they are entitled to judgment as a matter of law on Paradigm's breach of fiduciary duty claim.

Paradigm asserts that its claim for breach of fiduciary duty extends beyond Celeritas' filing of either the provisional or non-provisional patent applications, but includes the secret preparation of the '718 Application and the use of Paradigm's confidential information and trade secrets in filing those applications. Paradigm contends that absent the fiduciary relationship created by virtue of the parties' joint venture, Celeritas would not have been privy to Paradigm's processes – processes which embody its confidential information and trade secrets. As a result, Paradigm argues that Celeritas breached their fiduciary duty to Paradigm through secretly planning and ultimately applying for a patent on the Cartridge without disclosing such plans and applications to Paradigm during the fiduciary relationship.

Celeritas' claim that there was insufficient evidence to demonstrate they breached their fiduciary duty to Paradigm is unconvincing. When a joint venture is found to exist, the existence of a fiduciary relationship may be inferred.[31] A fiduciary is required "to act for the benefit of another person on all matters within the scope of their relationship," owing to another "the duties of good faith, trust, confidence, and candor."[32] Here, Paradigm presented evidence demonstrating that shortly after the parties entered into the joint venture and after receiving confidential and trade secret information from Paradigm, Celeritas began taking steps to apply for a patent for the product the parties agreed to jointly develop, own, market, and sell. Evidence was also presented indicating that Celeritas, while in this relationship, failed to inform, and possibly even concealed from

---

[31]*First Bank of Wakeeney v. Peoples State Bank*, 12 Kan. App. 2d 788, 793, 758 P.2d 234, 240 (1988).

[32]Black's Law Dictionary (8th ed. 2004).

Paradigm, the fact that they intended to patent the Cartridge. This evidence provided a legally sufficient basis to permit a jury to determine that Celeritas breached their fiduciary duty to Paradigm. Accordingly, we need not address Celeritas' arguments concerning events taking place after the parties agreed the joint venture ended. Therefore, Celeritas renewed motion for judgment as a matter of law is denied with respect to this claim.

### c. Paradigm's Theory on Damages

Celeritas argues that even with the existence of a joint venture and its attendant fiduciary duty, Paradigm's damages theory as presented at trial is fatally flawed because it failed to fit the facts of this case and because it fails under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[33] Celeritas once again challenges the testimony of David J. Ward, Ph.D, Paradigm's designated expert witness on damages. Celeritas argues that Dr. Ward's damage calculations failed to relate to the relevant time period of the parties' relationship, and was calculated to achieve the highest possible damages figure. Celeritas also argues, as they did during the November 13, 2009 *Daubert* hearing, that Dr. Ward's methods in calculating damages are unreliable and fail to meet the standards set forth in *Daubert*.

After reviewing Dr. Ward's trial testimony and his testimony at the *Daubert* hearing, we find no reason to alter the previous ruling issued by this Court regarding Dr. Ward's testimony. Therefore, based on the reasoning as explained in our November 17, 2009 Order, we conclude that Paradigm's damages theory was not legally defective, as Dr. Ward's testimony meets the standards as set forth in *Daubert*, and his conclusions were supported by the facts of this case.

---

[33]509 U.S. 579 (1993). Celeritas suggests that because the Court now has the benefit of Dr. Ward's trial testimony, it may now reconsider its previous ruling regarding their *Daubert* objections made prior trial.

### d. Fraud by Silence

Celeritas asserts that because no joint venture existed, they had no duty to disclose, and as a result, they are entitled to judgment as a matter of law in their favor on this claim. As previously discussed, sufficient evidence was before the jury to permit it to legally conclude that a joint venture existed, and in fact, the jury found such a relationship. Paradigm also presented sufficient evidence to satisfy the clear and convincing standard that Celeritas remained silent as to their intent and efforts to patent the Cartridge. While Lester testified that he was certain he told Allen he was going to file the February 19, 2004 patent application, other testimony was presented, including that from Allen and Paradigm's outside counsel, William Dakan, that Paradigm was not told of the filings. The jury was free to assess the credibility of each witness and determine the appropriate weight to give to each.

Evidence presented was also sufficient to permit the jury to reasonably conclude that it was unlikely that Paradigm or its counsel could have discovered the patent applications so as to question Celeritas about them. In filing the applications, Celeritas requested that they not be made public, and absent Celeritas informing Paradigm of their existence, Paradigm would neither have reason to search for them or likely locate such filings. Due to the parties relationship, Paradigm reasonably expected Celeritas to disclose this information because, as Paradigm's witnesses testified, such disclosure would have impacted the type of information disclosed in the development of the Cartridge. Thus, because sufficient evidence was presented to permit the jury to legally return a verdict in Paradigm's favor on its claim of fraud by silence, we deny Celeritas' motion with respect to this claim.

### e.  Misappropriation of Trade Secrets

Celeritas contends that because the testimony at trial failed prove that they disclosed any of Paradigm's trade secrets, they are entitled to judgment as a matter of law on this claim.  Celeritas argues that of the four alleged trade secrets testified to by Paradigm's President of GIS, Matt Brunett, no evidence indicated that Celeritas disclosed any of them.  Celeritas further asserts that nowhere in the patent applications does Celeritas make any reference to the processes Brunett described, claiming that they are seeking patent protection for Celeritas' software and not Paradigm's public awareness processes.

As Paradigm correctly asserts in its response, their principal claim of misappropriation has not been that Celeritas *disclosed* its trade secrets and confidential information, but that they *used* Paradigm's trade secrets in preparing, filing, and prosecuting the patent applications.  Evidence was presented at trial that the processes, as described by Brunett, were used in the patent applications by providing information and descriptions that otherwise could not have been provided absent Paradigm's processes.  As example, Brunett testified that as part of the patent applications, Celeritas included a map bearing Paradigm's job number that was generated through use of the four processes described by Brunett, without which the map would not have existed as presented by Celeritas in the application.[34]  Accordingly, the Court concludes that the evidence was sufficient to permit the jury to properly return a verdict in Paradigm's favor with regard to this claim.  Therefore, we deny Celeritas' motion with respect to Paradigm's misappropriation of trade secrets claim.

---

[34]Celeritas also argues in it Motion for New Trial that any reference to or discussion of the patent applications violated *Markman v. Westview Inst.*, 517 U.S. 370 (1996), because any such discussion required the Court to construe the claims presented in the patent applications.  The Court disagrees, and will address this issue later in this opinion.

### f. Breach of Contract

Celeritas argues that it is entitled to judgement as a matter of law for Paradigm's breach of contract claims. Celeritas once again argues that because they never disclosed Paradigm's confidential information in the patent applications, they did not breach any confidentiality or non-compete provisions of the contracts. Celeritas asserts among other things that, because the maps and software description were generally available to the public through the parties' marketing material, Celeritas did not breach any contract. They argue that disclosure of screenshots and maps cannot constitute breach of any obligation of confidentiality or disclosure as those items were part of the product's software product description, which was provided to potential customers without restriction. As such, Celeritas posits the information was made available by means other than through any alleged breach of confidentiality under the contracts, and thus, no liability results.

In response, Paradigm argues that Celeritas once again focuses solely on disclosure and ignores the improper "use" of its confidential information. Nevertheless, Paradigm asserts that its claim was not limited to just the screenshots that appears in the patent applications, but also included confidential information that Celeritas provided, without Paradigm's permission, to its patent attorney during the time the parties were exchanging information during the product's development stage. Specifically, Paradigm points to evidence demonstrating that in January to February 2004, while Celeritas was working with Paradigm and receiving confidential information regarding the product's development, Larry Miley, Celeritas' Product Manager, was secretly providing this information to Celeritas' patent attorney in the effort to patent the product. Paradigm contends that Celeritas' patent attorney was not a "need to know" person under the terms of the agreements.

Paradigm also asserts that the Reseller Agreement contained broad language not to compete. Paradigm argues that Celeritas' cease and desist letter, coupled with Celeritas' CEO Rob Cossins' testimony that Celeritas files patent applications to gain a competitive advantage, was more than sufficient evidence to permit a jury to find that Celeritas' took steps to compete with Paradigm in violation of the agreements.

The Court concludes that, in reviewing the record in a light most favorable to Paradigm, a legally sufficient evidentiary basis exists to permitted the jury to properly find for Paradigm on its contract claims. Evidence was presented demonstrating that specific information was shared during the development of the Cartridge, without Paradigm's knowledge or consent, and as previously discussed, used in pursuit of patenting the parties' jointly developed product. In addition, a jury could find from the evidence that identifying addresses within the buffer zone, which is an item identified by Celeritas in its filings, constitutes use of Paradigm's confidential information. Evidence was also provided that would permit a jury to conclude that Celeritas violated the non-compete provision of the Reseller Agreement, including Celeritas' patent filings on the Cartridge, the cease and desist letter sent to Paradigm, and Cossins' testimony relating to Celeritas' reasons for patenting products.

Celeritas also argues that even if there was a breach of contract, Paradigm has failed to prove damages caused by any such breach. We disagree. As a result of Celeritas' breach of these agreements, which also coincide with Paradigm's other claims, Paradigm lost the opportunity to develop its own public awareness software, which it began taking steps to complete prior to meeting Celeritas. As a result, Paradigm lost the associated profits and the ability to be first in taking its product to market. Celeritas' breaches of contract were a proximate cause of that loss. Therefore,

the Court concludes that the evidence presented could permit a jury to legally conclude that Paradigm's damages was caused by Celeritas' breach of the agreements. Accordingly, the Court denies Celeritas' renewed motion with respect to the breach of contract claims.

### g. *Computer fraud and abuse claim*

Celeritas argues that Paradigm's expert investigating the alleged hacking of its computers, Daniel Jablonski, was hired not by Paradigm, but by Paradigm's counsel to assist in this litigation and not to conduct any damage assessment of Paradigm's computers. Accordingly, Celeritas contends that Jablonski's fees for his services are not recoverable under the Computer Fraud and Abuse Act ("CFAA"). In support, Celeritas relies on an invoice sent by Jablonski to Mike Cargnel, one of Paradigm's counsel. Celeritas also claims that Jablonski failed to conduct any type of forensic examination of Paradigm's servers, further supporting their contention that his expense was in the course of litigation and not a loss under the CFAA. Finally, Celeritas asserts that Jablonski's fee was not based on an hourly rate, but an "agreed to" charge that is conveniently above the statutory requirement in order to be a qualifying loss under the CFAA.

Paradigm argues that the costs incurred in responding to a computer attack is a qualifying loss under the CFAA. Paradigm claims that it hired Jablonski to investigate Celeritas' attempted hacking to determine whether its computers were in fact accessed, and if so, determine whether any damage resulted. In doing so, Jablonski interviewed the owner of the hosting company for Paradigm's *PDQWeb* application, Aaron Gibbs. Jablonski later determined that Celeritas attempted several times to access Paradigm's *PDQWeb* application but was unsuccessful. Being unsuccessful, Jablonski found no damage to Paradigm's systems.

First, the Court finds Celeritas' argument that Jablonski was hired by Paradigm's counsel and not Paradigm unpersuasive. Although Jablonski sent an invoice to Paradigm's counsel on December 26, 2007, he testified at trial that he was hired by Paradigm, not by the Shook Hardy & Bacon law firm or by Mike Cargnel. Celeritas had the opportunity to question Jablonski regarding this statement, and they chose not to do so. The Court is unwilling to presume from this invoice alone that Jablonski was hired by Paradigm's counsel for the purpose of assisting in this litigation. Such a finding would be contrary to Jablonski's testimony and wholly speculative.

Jablonski testified that he was hired by Paradigm to investigate a possible hacking attempt into Paradigm's computer system. During this investigation, Jablonski interviewed Gibbs and also Paradigm's Vice President of Business Applications/Vice President of GIS/IT Matt Brunett. In addition to these interviews, Jablonski reviewed server logs, identified suspicious IP addresses, and eventually traced those IP addresses through the American Registry of Internet Numbers to Celeritas. After identifying the IP addresses, Jablonski reviewed the pattern of the attempted accesses to determine the username and passwords used. Jablonski also noted that password recovery was also attempted. While Jablonski testified that he did not himself physically examine the servers, Celeritas has provided no authority requiring him to do so. Based on the foregoing, we conclude that Paradigm's loss incurred through its investigation of Celeritas' attempted hacking of Paradigm's website application is a qualifying loss under the CFAA, and Celeritas' motion is denied.

### h. Punitive Damages

Celeritas contends that because Paradigm failed to provide clear and convincing evidence that Celeritas acted in a willful, wanton or malicious manner, Paradigm's punitive damages claims

should be dismissed. Paradigm responds by arguing that Celeritas' arguments on this issue are brought before the Court for the first time in its Rule 50(b) motion, and as a result, they should be denied.

After reviewing Celeritas' Rule 50(a) motion, including the arguments incorporated through their Motion for Summary Judgment, the Court concludes that Celeritas is raising this issue for the first time in this Rule 50(b) motion. As Paradigm correctly asserts, "issues not raised in an initial Rule 50(a) motion may not be asserted in a subsequent post-trial motion for judgment as a matter of law under Rule 50(b)."[35] Celeritas' arguments on this issue, therefore, are not properly before this Court, and as a result, we will not now address them.

### 3. Celeritas' Motion for New Trial and/or to Alter or Amend Judgment (Doc. 507)

Celeritas moves for a new trial pursuant to Rule 59(a) & (e) of the Federal Rules of Civil Procedure. The Court has already identified the standard for reviewing a motion for new trial under Rule 59(a) *supra* is Section 1 of this Order. A motion to alter or amend judgment pursuant to Rule 59(e) may be granted only if the moving party can establish: (1) an intervening change in the controlling law; (2) the availability of new evidence that could not have been obtained previously through the exercise of due diligence; or (3) the need to correct clear error or prevent manifest injustice.[36] Such a motion does not permit a losing party to rehash arguments previously addressed or to present new legal theories or facts that could have been raised earlier.[37]

---

[35]*Meyer v. Christie*, 2009 WL 4782118, at *6 (D. Kan. Dec. 8, 2009) (citing Fed. R. Civ. P. 50; *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993)).

[36]*Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995).

[37]*Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996), *cert. denied*, 520 U.S. 1181 (1997).

### a. Improper Arguments and Incompetent Evidence Concerning Patent Issues

Celeritas claims that throughout the entire trial, Paradigm made improper arguments and introduced incompetent evidence concerning issues involving the patent applications. Celeritas argues that Paradigm built its case on the theory that Celeritas stole and attempted to patent Paradigm's ideas and business processes to prevent Paradigm from competing in the marketplace. Celeritas asserts that due to the scope of Paradigm's claims, the central question is whether the patents admitted into evidence cover Paradigm's ideas, processes, and basic business model. Celeritas contends that to answer this question, the Court must, according to the Supreme Court's holding in *Markman v. Westview Instruments Inc.*,[38] construe the claims in the patent applications.

*Markman* was an action where the holder of a patent for inventory control sued a competitor for patent infringement. After hearing expert testimony regarding the meaning of the claims in the patent, a jury found that the defendant infringed on Markman's inventory control patent. Thereafter, the court directed a verdict in the defendant's favor on the basis that the defendant's device was unable to track "inventory" as that term was used in the patent claim. Both the Court of Appeals for the Federal Circuit and the Supreme Court affirmed, holding that the interpretation of a term of art within a patent, which in the case before them, the term "inventory," was an issue for the court, not a jury.[39]

Paradigm argues that referencing patent applications during trial neither coverts this suit to a patent case nor does it invoke *Markman*. Paradigm asserts that the language employed in the patent applications, along with images that depict certain results that could only be obtained through

---

[38]517 U.S. 370 (1996).

[39]*Id.* at 390-91.

those processes, was the same language and images that the parties used in their product description for the Cartridge and other documents developed during the product's development. Paradigm contends that although it read parts of the patent applications to the jury, such a reading does not, as Celeritas suggests, require the Court to construe any of the patents' claims.[40] Rather, Paradigm contends that the patent applications are simply evidence of Celeritas' misconduct, and the fact that these documents were eventually submitted to the Patent Office does not render them off-limits to the jury.

As Celeritas correctly asserts, a "patent case" is one in which either "federal patent law creates the cause of action or [where] the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the . . . claims."[41] Celeritas does not contend that federal patent law creates this cause of action, but instead, argues that Paradigm's claims turn on a substantial question of federal patent law. Celeritas, however, fails to identify that substantial question of federal patent law. Celeritas does argue that by reading portions of the patent applications to the jury, Paradigm created questions that required to Court to construe the patent's claims and instruct the jury on what those claims mean. Simply reading portions of a patent application at trial, however, does not trigger a substantial question of patent law, nor does it require the Court to construe the patent claims contained in the application from which portions were read. Accordingly, we deny Celeritas' motion.

---

[40]Celeritas later argues that the Court erred by excluding the testimony of their own patent attorney, James Stipek, and suggested that his testimony would have included a comparison of the language used in Celeritas' patent applications to the language Paradigm included in a previous patent application. Ironically, Celeritas contends that such testimony by Stipek would not invoke *Markman* and require the Court to construe patent claims, while similar testimony introduced by Paradigm's witnesses does invoke *Markman*.

[41]*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988).

### *b.  Exclusion of Testimony from Celeritas' Patent Counsel*

Celeritas also contends that a new trial is required because they were precluded from calling their patent counsel, James Stipek, as a witness, and their case was prejudiced as a result.  Celeritas argues that through "ambush tactics," Paradigm blatantly mischaracterized to the Court the nature of Stipek's deposition testimony, and based on this mischaracterization and without first reviewing the deposition transcript or permitting any briefing, the Court erred by hastily precluding his testimony.  Celeritas further suggests the Court erred because it excluded Stipek's testimony in its entirely when they represented to the Court that they would not ask any questions of Stipek at trial to which he was instructed during his deposition to not answer.  Paradigm, however, argued at trial, and in its response, that during Stipek's deposition, questions posed by Paradigm relating to the patent applications and other issues involved in this action were continuously blocked by Celeritas' counsel, who asserted attorney-client privilege on questions that were clearly outside the realm of such privilege.  Paradigm also argues that Stipek was unable to testify as to the '718 and '847 patent applications because he failed to read them prior to his depositions.  Paradigm claimed, and Celeritas did not dispute, that Stipek received notice that those applications would be topics covered in his deposition.  Paradigm further argues that any testimony by Stipek would have to have been in the form of expert testimony, and because he was not designated to testify as an expert, permitting such testimony would be prejudicial to Paradigm.  Paradigm further contends that because Stipek was not permitted to testify during deposition on a multitude of topics relating to this case, any testimony permitted as a fact witness would be fundamentally unfair and prejudicial to Paradigm, and it would have no basis to impeach his trial testimony due to his conduct at his deposition.

Paradigm called Stipek as a fact witness during its case-in-chief, and to the extent Celeritas had the opportunity to cross-examine him on issues within the scope of that testimony and chose not to, they cannot meaningfully claim prejudice now. The Court is also convinced, as it was at trial, that Celeritas' counsel precluded Stipek from testifying during his deposition to a number of questions concerning this action claiming attorney-client privilege that were clearly outside the scope of that privilege. Celeritas now proffers a number of topics that Stipek would have testified at trial, but those topics were not made known to the Court during trial in response to Paradigm's arguments to exclude Stipek.[42] Instead, Celeritas proffered generally that Stipek would testify as to the non-publication request, which he prepared, and to two non-publication requests already in evidence that were part of the patent applications. The Court found this limited offer of proof insufficient to overcome the fact that Stipek was precluded from testifying during deposition with respect to those very same patent applications that Celeritas contends he would now testify to at trial. Celeritas' counsel repeatedly asserted at trial, to his credit, that he was not present during Stipek's deposition and was not familiar with the events that took place. Nevertheless, being unfamiliar with the circumstances surrounding his case does not excuse counsel from presenting the Court with an appropriate response to overcome objections or oral motions during trial.[43] Therefore, based on the foregoing and our review of the record, we conclude that Stipek's testimony was appropriately excluded at trial.

---

[42]See Fed. R. Civ. P. 103(a); see also Perkins v. Silver Mt. Sports Club & Spa, LLC, 557 F.3d 1141, 1147 n.4 (10th Cir. 2009).

[43]The Court notes, however, that notwithstanding the foregoing and taking into account Mr. Rhodes limited exposure to this case prior to trial, he very competently represented his clients' interests throughout these proceedings.

### c. Testimony of Scott Evans, Celeritas' Chief Engineer

In addition to the reasons previously discussed, Celeritas moves for new trial on the basis that the Court improperly stuck a portion of the testimony of its Chief Engineer, Scott Evans. Prior to trial, the parties invoked rule 615 of the Federal Rules of Evidence to exclude witnesses from the courtroom prior to their testimony. During trial and over a lunch recess, Celeritas' counsel prepared Evans for his testimony after Paradigm's witness, Matt Brunett, testified as to Paradigm's confidential processes. While Celeritas' counsel admittedly used an interrogatory answer to prepare Evens, Paradigm claimed that such preparation shaped Evans' testimony based on events from the courtroom, specifically Brunett's testimony. Paradigm claims that in essence, this conduct provided Evans a "sneak peek" of Brunett's testimony from the courtroom through counsel, which is a violation of Rule 615. As a result, the Court struck a limited portion of Evans' testimony regarding the development of their own system, but permitted the exhibit regarding Evans' audience identification process (Trial. Ex. 154), a subject of his testimony, to remain admitted.[44]

It is within the trial court's discretion to exclude the testimony of a witness that violates the court's sequestration order.[45] The Court should generally not disqualify a witness "unless allowing the testimony would result in "probable prejudice."[46] Probable prejudice results where it is shown that the conduct giving rise to the Rule 615 violation had "an apparent effect or influence on the

---

[44]Upon the Court informing counsel for all parties of its inclination to strike the limited portion of Evans' testimony and permit the trial exhibit to remain in evidence, Celeritas' counsel stated that such an order was acceptable. Vol. 9 Trial Tr. p. 133 (Doc. 469).

[45]*Ives v. Boone*, 101 Fed. Appx. 274, 282 (10th Cir. 2004) (citing *United States v. McVeigh*, 106 F.3d 325, 330 n.3 (10th Cir. 1997)).

[46]*Id.* (citing *Burks v. Okla. Pub. Co.*, 81 F.3d 975, 980 (10th Cir. 1996)).

witnesses' testimony."[47]  Here, Celeritas' counsel prepared Evans' testimony based on Brunett's specific testimony regarding Paradigm's confidential processes, which was provided during trial only after the Court closed the courtroom.  Although Brunett's exact testimony was not disclosed to Evans, Celeritas carefully prepared and guided his testimony as a direct result of Brunett's testimony, and the fact that they were able to locate an outside source of information to complete that preparation and did not disclose to Evans why such information was important to his testimony is not of consequence.  It was clear from the manner in which Evans answered questions that his testimony was influenced by this pre-testimony preparation.  To permit this specific type of pre-testimony preparation to influence a witnesses' testimony based on information obtained through the in-court testimony of another witness would ultimately serve to largely nullify the purpose for which Rule 615 exists.  Therefore, we conclude that probable prejudice to Paradigm resulted from Celeritas' violation of the Court's sequestration order, and that the limited exclusion of Evans' testimony was proper.

### d. Amend Judgment to Reduce Actual Damages

Celeritas argues that the Court should reduce the amount of actual damages because the amount awarded by the jury is not supported by the evidence.  Celeritas asserts that the Court must examine the evidence for only a three to six month time period in 2004, which clearly demonstrated that total sales for the Cartridge was only $182,768, far below the one-million dollar verdict. Paradigm suggests that Celeritas' time period is flawed, arguing that had it never entered into this joint venture with Celeritas, it would have taken more than a 3-6 month time period to continue with and finish development of its Cartridge-equivalent product, roll it out, and be first to market.

---

[47]*United States v. Salcido-Luzania*, 1999 WL 176130, at *6 (10th Cir. Mar. 31, 1999) (citing *United States v. Greschner*, 802 F.2d 373, 376 (10th Cir. 1986)).

Celeritas' arguments concerning Paradigm's damages theory and the evidence supporting damages are not new to the Court. Celeritas has previously raised this issue in their motion to exclude Dr. Ward's testimony, in a motion in limine, and in their renewed motion for judgment as a matter of law, where the Court concluded that Paradigm's damages theory was sufficient. The Court also determined that the evidence presented at trial supported Paradigm's theory, and it was for the jury to determine the actual amount from that evidence. Therefore, the Court will not once again revisit the issue here other than to state that our review of the record demonstrates that the evidence presented to the jury supports the actual damages award covering the time period that Paradigm would have sold its equivalent product, which encompassed more than a three to six month time period in 2004. Therefore, Celeritas' motion to reduce the actual damages awarded is denied.

### e. Instruction on Celeritas' Financial Condition regarding Punitive Damages

Celeritas also argues that the Court should grant a new trial on punitive damages because the jury was not instructed to consider Celeritas' financial condition when determining whether to award such damages. Celeritas argues that Paradigm failed to present evidence of Celeritas' financial condition and suggests that they themselves had no burden to present such evidence. The burden of presenting evidence of financial condition as a mitigating factor to punitive damages, however, rests with Celeritas, and not Paradigm.[48] Notwithstanding where the burden rested, neither Celeritas nor Paradigm presented any evidence directly relating to Celeritas' financial condition, and any instruction relating to a financial condition never presented to the jury would be meaningless and call for speculation. Thus, because there was no evidence for the jury to consider regarding

---

[48]*See Laughinghouse v. Risser*, 786 F. Supp. 920, 926-27 (D. Kan. 1992); *see also Folks v. Kan. Power & Light Co.*, 243 Kan. 57, 75, 755 P.2d 1319, 1334 (1988) (*overruled* on other grounds).

Celeritas' financial condition in awarding punitive damages, it was proper for the Court to exclude that instruction.[49]

### f. Amend Judgment to Reduce Punitive Damages

Celeritas also moves the Court to reduce the punitive damages amount, arguing that the amount awarded was excessive. In determining the constitutionality of a punitive damage award, the Court must consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[50]

### 1. Reprehensibility

When determining the reasonableness of a punitive damage award, the most important of these guideposts is the reprehensibility of the defendant's misconduct.[51] In assessing reprehensibility, the Court considers whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice,

---

[49]*See Folks*, 243 Kan. at 76, 755 P.2d at 1334 (citing *State v. Houck*, 240 Kan. 130, 139, 727 P.2d 460 (1986)).

[50]*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). It is important to note that the Supreme Court did not devise these principles to evaluate whether punitive damages should be awarded, but rather, they were formulated to determine whether an award is grossly excessive and violates due process. *See id.* at 417 ("To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property.")

[51]*Gore*, 517 U.S. at 576.

trickery, or deceit, or mere accident."[52]  Punitive damages may be justified with as little as one factor, depending on the reprehensibility of the defendant's conduct.[53]  The absence of all factors, however, "renders any award suspect."[54]

Celeritas argues that all of these factors weigh against the punitive damages award.  The first factor considers the nature of the injury.  Neither party contends that the harm caused by Celeritas' acts were physical, and thus, Paradigm's injury was purely economic in nature.  But economic injury may still result in significant penalty when the acts complained were intentional.  As the Supreme Court explained, "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty."[55]  The Supreme Court, however, cautioned that "this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages."[56]  Here, the evidence supports finding that Celeritas' actions were intentional, demonstrated by their affirmative acts of misconduct in using Paradigm's confidential information, obtained solely as a result of the parties' joint venture relationship.  Thus, this factor weighs in favor of the punitive damages award.

The second factor does not support a punitive damages award.  The conduct at issue does not reveal an indifference to or a reckless disregard of the health or safety of others.

---

[52]*Campbell*, 538 U.S. at 419.

[53]*Id.*

[54]*Id.*

[55]*Gore*, 517 U.S. at 576.

[56]*Id.*

The third factor of reprehensibility considers Paradigm's financial vulnerability. Here, there is no evidence that Paradigm was in a position of financial weakness when compared to Celeritas, and because neither party asserts such a claim, we conclude that this factor does not favor a punitive damages award.

The fourth factor addresses whether the conduct at issue involved repeated actions or was simply an isolated incident. Celeritas argues that their conduct involved only a one-time omission, and accordingly, is not reprehensible conduct. Paradigm, however, claims that Celeritas' conduct involved multiple instances of breaching their fiduciary duty and false statements over the entire length of their joint venture relationship. Nevertheless, Paradigm asserts that even if Celeritas' conduct is viewed as one instance, that one instance had substantial results that supports the punitive damages award. The Court agrees that based on the evidence, Celeritas' conduct giving rise to breach of their fiduciary duty entailed more than simply a one-time omission. The parties' joint venture relationship spanned several months, and during that time, there were multiple instances where Celeritas took actions for their own benefit at the expense of Paradigm when they had the duty to disclose such actions. Thus, we conclude that this factor supports the punitive damages award.

The fifth factor assesses whether the harm resulted from intentional malice, trickery, or deceit, or whether it was merely the result of accident or oversight. It is clear that Celeritas' conduct was not the result of accident or oversight. Evidence demonstrated, among other things, that within the parties' fiduciary relationship, Celeritas failed to disclose to Paradigm that they were using confidential information obtained from Paradigm in their patent applications. In addition, Celeritas took steps to prevent the filings from being publicly available, which also impacted Paradigm's

ability to learn of the filings.  Based on the record, we conclude that this factor supports a punitive damages award.

Taken as a whole, the Court concludes that the factors reveal a level of reprehensible conduct by Celeritas that supports a punitive damages award.

### 2. Ratio

While the Supreme Court has declined to establish a bright-line ratio for which a punitive damages award cannot exceed, it has established that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."[57]  It is the Court's responsibility to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."[58]

In this case, the ratio between punitive damages and compensatory damages is 2.3 to 1.[59] Paradigm's only argument in support of the award is that this ratio is well within the single-digit range favored by the Supreme Court, and accordingly, is a reasonable punitive damages award complying with due process.  Celeritas' argument is based on their position that the Court should reduce the actual damages amount to $101,253 under one theory, and $35,469 under another.  Based on those actual damages figures, Celeritas argues that the punitive damages award is anywhere from 15:1 to 30:1, and therefore, presumptively excessive.

---

[57]*Campbell*, 538 U.S. at 425.

[58]*Id.* at 426.

[59]The jury's punitive damages award of $1,562,420 was based on its compensatory damages award of $660,735 for Paradigm's loss resulting from Celeritas' breach of fiduciary duty, fraud, and misappropriation of trade secrets.

The Court declined to reduce the amount of actual damages, and therefore, Celeritas' argument is without merit. In addition, as part of the jury's verdict, it found that Celeritas' conduct was willful, wanton, and malicious to such degree as to award punitive damages in an amount just over two times the actual damages awarded. We see no reason to conclude as a matter of law that this amount is unreasonable in light of the evidence presented. The Court, therefore, concludes that a ratio of 2.3 to 1 is reasonable and proportionate to the amount of harm suffered by Paradigm and to the amount of compensatory damages it recovered.

Celeritas also argues that this amount is excessive due to its size and wealth. As previously discussed, Celeritas failed to present any evidence during trial regarding its financial condition for the jury to consider. When denying Celeritas' request to include an instruction requiring the jury to consider Celeritas' financial condition when computing punitive damages, the Court informed Celeritas' counsel that should the jury return a punitive damages amount that exceeded the statutory cap on punitive damages pursuant to K.S.A. 60-3702(e),[60] the Court would entertain a post-trial motion and hold an evidentiary hearing to address that issue.[61] Celeritas, however, has filed no such motion nor have they argued in any post-trial motion that the amount of the punitive damage award exceeds Celeritas' highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded. Accordingly, the Court must presume that the punitive damages award falls within that statutory standard.

---

[60]The relevant portion of K.S.A. § 60-3702(e) provides: "no award of exemplary or punitive damages pursuant to this section shall exceed the lesser of: (1) The annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded, unless the court determines such amount is clearly inadequate to penalize the defendant, then the court may award up to 50% of the net worth of the defendant, as determined by the court."

[61]Vol. 9 Trial Tr. p. 185 (Doc. 469).

### 3. *Civil Penalties Authorized or Imposed in Comparable Cases*

The third guidepost requires that the Court look at the "disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases."[62]  Celeritas argues that a comparison of civil or criminal penalties is not applicable to this case, which mitigates a large punitive damages award.  Paradigm argues that the Economic Espionage Act,[63] provides a criminal penalty of up to ten million dollars for organizations, and a fine of up to five million dollars, clearly placing Celeritas on notice as to the potential for punitive damages.  The Economic Espionage Act, however, only applies when the organization violating the act does so intending or knowing that the "offense will benefit any foreign government, foreign instrumentality, or foreign agent."[64]  This situation does not exist with this case.  Thus, neither party's arguments are useful to the Court.

The Kansas Uniform Trade Secrets Act ("KUTSA")[65] provides that misappropriation of trade secrets may subject the violator to punitive damages.  If a party misappropriates trade secrets in a willful and malicious manner, punitive damages may be awarded "in an amount not exceeding twice any award made under subsection (a)."[66]  In this case, the jury's punitive damages award was based on three of Plaintiff's claims, breach of fiduciary duty, misappropriation of trade secrets, and fraud.  The verdict form did not permit the jury to assign a specific amount for each individual claim, but instead, only permitted it to return one total punitive damages award inclusive of all three claims.

---

[62]*Campbell*, 538 U.S. at 428.

[63]18 U.S.C. § 1831.

[64]18 U.S.C. § 1831(a).

[65]K.S.A. § 60-3320 *et seq.*

[66]K.S.A. § 60-3322(b).  Subpart (a) of this statute identifies recoverable damages.

Nevertheless, because the jury returned a verdict on all three claims in Paradigm's favor, it is reasonable to conclude that the jury's punitive award based on misappropriation of trade secrets falls within this statutory cap. Further, claims of fraud and breach of fiduciary duty also may give rise to punitive damages in Kansas,[67] and thus, Celeritas was placed on sufficient notice that they were subject to exemplary damages for their conduct. The fact that the punitive award was in excess of the KUTSA's statutory cap does not render the award unreasonable considering that the award was inclusive of the three claims.

After reviewing the requisite guideposts as set forth by the Supreme Court, we conclude that the punitive damages awarded are not unconstitutionally unreasonable, and therefore, we deny Celeritas' motion.

4.      **Paradigm's Motion to Alter or Amend Judgment to Add Declaratory Relief and a Constructive Trust (Doc. 503)**

Paradigm moves the Court to alter or amend the judgment to include both a declaration that it is a fifty percent co-owner of the patent applications and to impose a constructive trust on any benefits, rights, or interests that Celeritas has or will obtain from the patent applications. Paradigm contends that, because the jury found in its favor on its claims for breach of fiduciary duty, fraud, and misappropriation of trade secrets, it is now entitled to the declaratory relief requested. Paradigm argues that declaratory relief is appropriate and does not constitute double recovery because the jury awarded compensatory damages for its past injury, and the declaratory relief targets the harm Paradigm will suffer in the future based on patents that may issue from those applications.

---

[67]*See, e.g., Hanson v. Hackman Corp.*, 2008 WL 4471679, at *18 (Kan. Ct. App. Oct. 3, 2008); *Linquist v. Ayerst Labs., Inc.*, 227 Kan. 308, 316, 607 P.2d 1339 (1980) (citing *Modern Air Conditioning*, 226 Kan. at 79, 596 P.2d at 824).

Paradigm relies on *Foster v. Boch Industries*[68] to support its claim that it is entitled to receive ownership rights in the patent applications. In *Foster*, the plaintiff asserted claims of breach of contract, conversion, and misappropriation of trade secrets and sought, among other relief, a declaration that he was either the sole inventor or a co-inventor/co-owner of the technology covered by the defendant's patent applications. The court concluded that because the patent applications were pending before the Patent and Trademark Office, the court had no jurisdiction to declare the plaintiff to be a co-inventor of the technology included within the applications.[69] The court, however, granted the plaintiff's request for declaratory relief with respect to co-ownership of the patent applications, but only because it was undisputed that the defendant represented to the plaintiff that he would have an ownership interest in the particular patent applications.[70] Here, we have no such undisputed fact. As Paradigm has consistently asserted and as the evidence suggested, the parties agreed to co-own and co-develop the Cartridge. However, at no time has the evidence suggested that there were any agreements or representations that Paradigm would be a co-owner in the patent applications. Thus, this case does not support Paradigm's position.

Contrary to Paradigm's contentions, to provide the equitable relief requested and give Paradigm a 50% ownership interest in the pending patent applications would require the Court to

---

[68]2009 U.S. Dist. LEXIS 15185 (W.D. Ark. Feb. 26, 2009).

[69]As the basis for this conclusion, the court in *Foster* relied on federal patent law, which provided that "[w]hen an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title." Furthermore, "[w]henever . . . through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Director may permit the application to be amended accordingly, under such terms as he prescribes." *Foster*, 2009 U.S. Dist. LEXIS 15185, at *7 (quoting 35 U.S.C. § 116). "Courts that have construed this provision have held that it does not create a cause of action in the district courts to modify inventorship on pending patent applications." *Id.* (citing *E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578 (6th Cir. 2003), *cert. denied*, 541 U.S. 1027 (2004)).

[70]*Id.* at *9.

construe the applications, which we decline to do at this point of this litigation. While it may be true, as Paradigm asserts, that it has claimed an ownership interest in the patent applications from the beginning of this action, it failed to raise this issue with the Court at any point past the Pre-Trial Order, and this issue was not presented at any time during trial. Thus, it appears Paradigm made the strategic choice to proceed without raising this claim. The Court concludes that the jury verdict provided an adequate remedy for Paradigm's injury.[71] Paradigm's motion is therefore denied.

**IT IS THEREFORE ORDERED** that Celeritas' Motion for New Trial Regarding their Counterclaims (Doc. 497) is hereby DENIED.

**IT IS FURTHER ORDERED** that Celeritas' Renewed Motion for Judgment as a Matter of Law (Doc. 505) is hereby DENIED.

**IT IS FURTHER ORDERED** that Celeritas' Motion for New Trial and/or to Alter or Amend the Current Judgment (Doc. 507) is hereby DENIED.

**IT IS FURTHER ORDERED** that Paradigm's Motion to Modify, Alter, or Amend the Judgment to Add Declaratory Relief and a Constructive Trust (Doc. 503) is hereby DENIED.

**IT IS SO ORDERED.**

Dated this 2nd day of July, 2010, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[71]Because these patent applications are pending before the Patent and Trademark Office, Paradigm is not without remedy as to these patent applications and may present its arguments challenging the validity of Celeritas' patent claims to that authority following relevant patent law.